283 So.2d 699 (1973)
Louis E. MOOSSY
v.
HUCKABAY HOSPITAL, INC.
No. 52868.
Supreme Court of Louisiana.
September 24, 1973.
Rehearing Denied October 26, 1973.
*700 C. P. Brocato, Brocato & Mangham, W. Gene Carlton, Shuey, Smith & Carlton, Shreveport, for plaintiff-applicant.
Henry Bethard, III, Bethard & Bethard. Coushatta, for defendant-respondent.
BARHAM, Justice.
We are required to interpret a written contract between these parties to determine if it is the complete agreement between them and if it expresses the intent of the parties, especially in regard to the price for services rendered by one of the parties. The trial and appellate courts resorted to parol evidence to fix the contractual terms. We conclude the written contract is the complete agreement of the parties, and that the parol evidence was erroneously considered.
On January 13, 1966, Huckabay Hospital, Inc., through its President, Jackie D. Huckabay, M. D., entered into a contract with Louis E. Moossy, an architect, for the architectural services necessary for constructing a 40-bed hospital in Coushatta, Louisiana. The contract was made on the standard American Institute of Architects form but required work of the architect under three phases, rather than the usual four provided under that standard form. The architect was to provide, under the preliminary design phase, preliminary design studies and a general description of the Project for approval by the Owner. The design phase clause also provided that the architect "* * * should submit to the Owner a statement of the probable project construction cost based on current area, volume or other unit costs". Phase 2 was the Construction Documents Phase, which required the final design setting forth in detail the information necessary for bidding and letting of a contract, and required the Architect to keep the Owner informed of any adjustments to previous statements of the probable project construction cost. Phase 3 provided for the construction phase of the hospital and included the obligation of the Architect to assist the Owner in obtaining proposals from contractors and in awarding and preparing the construction contracts.
The Architect's fee for the basic services was to be calculated at 7% of the project construction cost. Extra services were under a separate contract, and services rendered in connection with air conditioning were to be calculated on a different basis. The standard termination clause in the contract was altered by the following insertion:
"The following shall be a part of this contract, and if this Section D is in conflict with any other provision or provisions of this contract Section D shall control and govern.
1. The owner may terminate this contract at any stage by giving written notice to the Architect and thereafter the Architect will perform no further service.
2. In the event this contract is terminated, the Architect shall be paid only for such services as he has performed and for such obligations and expenses that he has incurred (including fees of *701 engineers) to the date of the termination. In the event such termination should come after completion of the preliminary studies the fee shall be as stated in the contract and should the termination be made after the completion of final plans and specifications the fee shall be as stated in the contract.
3. The Architect shall perform no extra services or incur any extra expense whatsoever, and the Owner shall not be responsible for the payment of any sums beyond the seven per cent. (7%) of the project construction cost and the four per cent. (4%) of the cost of air conditioning and for work let under separate contract, unless the Owner specifically authorizes the extra work and extra expense in writing and which authorization shall specifically state the extra work and expense and the sum or sums the Owner is to pay therefor."
In regard to the basic services fee of 7 per cent of the "project construction cost", the contract dictated that the "project construction cost" would be determined by one of the following (priority to be determined by the order in which the provisions appear):
(a) The lowest acceptable bona fide bid;
(b) The estimate of project construction cost if under a fixed limit.
(c) The Architect's latest statement of probable project construction cost.
Although the contract provided:
"If the estimated project construction cost or the lowest bona fide proposal is in excess of any limit stated herein, the Owner shall give written approval of an increase in the limit, or he shall cooperate in revising the project scope or quality, or both, to reduce the cost as required",
no limit of construction cost was in the contract. The Architect's fee was to be paid as follows:
"Upon completion of preliminary studies a sum equal to 25% of the basic rate computed upon a reasonable estimated cost.
* * Construction Document Phase:
Upon completion of specifications and working drawings a sum sufficient to increase payments on the fee to 75% of the basic rate and other rates arising from this agreement, computed upon a reasonable cost estimated on such completed specifications and drawings, or if bids have been received, then computed upon the lowest bona fide bid or bids.
* * * Construction Phase:
From time to time during the course of construction and in proportion to the amount of service rendered by the Architect, payments shall be made until the aggregate of all payments made on account of the fee shall a sum equal to the basic rate and other rates arising from this agreement, computed upon the entire and final cost of the work."
The preliminary plans were completed on March 1, 1966, submitted to the Owner, and on April 8, 1966, Dr. Huckabay paid $5,250, pursuant to a billing of March 31, 1966, for that amount, with a note stating:
"Note: Preliminary estimate equals $442,486.00. However, as a consideration to Dr. Jackie D. Huckabay at this time, the figuer of $300,000 will be used and the architectural fee will be adjusted according to the actual construction cost after bids are taken." (Emphasis here and elsewhere supplied).
On September 12, 1966, the second cost estimate of $499,210.00 was submitted to Dr. Huckabay. It was noted:
"The above estimate is approximate and general. The above estimate does not include paving, future expansion or demolishing or altering existing buildings. A more accurate estimate may be obtained upon completion of working drawings and specifications."
*702 After receiving this revised cost estimate, a plan sheet, # 2, which indicated alterations and changes made in response to requests by Dr. Huckabay, was submitted. Dr. Huckabay wrote to Moossy on September 21, 1966 as follows:
"* * * The changes look fine to me, and I am pleased with the plans thus far."
Later, on November 7, 1966, Dr. Huckabay, in a letter to Moossy requesting some changes which would incur additional costs, stated additionally:
"* * * Otherwise, everything seems to be in good order and I am generally well pleased, except, of course, I would like to have had the plans completed sooner. This, I understand, is an impossibility."
On January 26, 1967, at the request of Dr. Huckabay, Moossy sent to the President of the Bank of Coushatta a letter, enclosing a prospectus of the hospital, which was to be a 42-bed, 146-room, totally airconditioned structure with a total of 21,843 square feet, to be constructed at an approximate cost of $500,000.00. A copy of this letter was forwarded to Dr. Huckabay. Upon completion of the final specifications and in preparation for letting bids, it was submitted that the construction cost could be estimated in round figures at about $500,000.00.
The following bids were received on June 20, 1967:
$821,018; $862,000; $901,000; an incomplete bid, not valid$844,106.
Since the bids were far in excess of the estimated cost of construction, Dr. Huckabay set a conference to determine the future prospects for the hospital. Moossy called the low contract bidder, McInnis Brothers, Inc. to send a representative to this meeting. The conference was attended by Moossy and his engineers, Dr. Huckabay and a stockholder of the corporation, and a representative of McInnis, the contractor. Moossy and his engineers submitted changes to Dr. Huckabay and to the McInnis representative as tentative alterations of plans for cost reductions to meet the $500,000 estimated project production cost. McInnis was of the opinion that these were not sufficient to bring the cost figure close to the estimated project production cost. Moossy then advised that he could reduce the cost by $349,000 so as to come well within the $500,000 cost estimate.
There is a conflict in the testimony as to the results of the conference. By letter dated June 29, Dr. Huckabay, in accordance with the termination agreement in the contract, notified Moossy that he was terminating the contract. Moossy then filed suit against Huckabay Hospital, claiming the fees as prescribed in the contract, based on the lowest bid of $821,018. In the alternative he claimed that he was entitled to 75% of 7% of the projected cost of $500,000, plus an additional sum equal to 75% of 4% of the cost of air conditioning, all calculated to be $28,500, less a credit for the $5,250 received at the time the preliminary specifications were submitted. Huckabay Hospital answered, denying the plaintiff's demands, and reconvened for expenses incurred for loss of profits resulting from construction delays and for return of the $5,250 paid for Moossy's work and services in preparing the preliminary plans and specifications. The trial court denied both principal and reconventional demands. The appellate court denied the principal demand and denied the reconventional demand for expenses and loss of profits. However, it awarded to the defendant the return of the $5,250 fee paid for preliminary specifications. 266 So.2d 235 (1972). We granted certiorari on the application of Moossy. 263 La. 91, 267 So.2d 206 (1972).
Extensive oral and documentary evidence was introduced in the trial court and was considered by the appellate court. We are of the opinion that the contract is clear, concise and unambiguous, not permitting *703 of parol evidence to vary the terms of such a written agreement. La. Civil Code Article 2276.
Reviewing the written contract between Dr. Huckabay and Moossy for the latter's architectural services, no limit on the construction cost is contained in the contract. Moreover, the project construction cost is defined in the contract and the architect's principal fee was to be based upon the project construction cost as defined in the contract. The Owner had the privilege of terminating the contract at any stage, simply by giving written notice to the architect, and all services would be terminated upon such notice. Only earned fees at the time of notice could be claimed by the architect. Although the first 25% of the architect's fee, $5,250, was computed on the basis of $300,000, the architect's estimate of "project construction cost" was given to the Owner in writing at that time as $442,486, and the calculation on the lower basis was made only as a consideration for Dr. Huckabay. Under the express terms of the written contract, Moossy, the architect, was entitled, as of the time of the notice of termination, to a fee of 7% of 75% of the estimated project cost of $499,210, since no bids were accepted.
Although we have determined parol evidence inadmissible to vary this concise commitment, a review of the parol testimony and documentary evidence establishes that nothing was omitted from the instrument which need be supplied by the parol evidence. Moreover, our review buttresses the conclusion that the whole contract was contained in the written instrument and that the contract expressed the intention of both parties in all respects to the dispute here.
Although Dr. Huckabay had the right to terminate the contract at any time, as can be seen from a review of the facts, Dr. Huckabay not only did not terminate, but was constantly commendatory of Moossy's services. His written communications in the record reflect his satisfaction with the architectural services. They also establish that he constantly requested additional changes in the project which affected its cost. Dr. Huckabay wanted a quality hospital (sometimes referred to by various witnesses as a "fancy" hospital), with every facility including extras which are not even found in all of the larger hospitals. The additional changes made at Dr. Huckabay's request, especially the change in regard to building so that there could be future expansion, required sharp cost increases. Dr. Huckabay's letters establish that he was aware of the additional costs which would be incurred by the changes; Moossy's correspondence establishes that he communicated the increasing project cost as the plans were changed. Other factors admittedly entered into the cost increases during the year and a half between the contract for the architectural services and the opening of bids.
From a perusual of the testimony of all of the witnesses in the case, it can be ascertained that the parties never fixed a limit on the construction cost of the hospital. To the contrary, Dr. Huckabay's testimony is very qualified when he speaks of a $350,000 fixed limit. Directly in opposition to his qualified declarations in this regard, which contain discrepancies, especially between his deposition and his testimony at the trial, there is the documentary evidence of cost estimate figures submitted to him and letters of approval which were in turn forwarded to Moossy. As Dr. Huckabay paid the preliminary specifications fee, based on $300,000 as a consideration to him, he was on written notice that the cost estimate then was $442,486. Even after notice of a $499,216 cost estimate in September, he paid written compliments to Moossy for the services rendered to that date. After a final projected round figure project cost of $500,000 was given, he was urgent in his demands that the bids be received.
The totality of the testimony and the documentary evidence supports completely *704 our original holding that the written contract contained every element of the agreement between these parties and reflected concisely the intent of the parties. We have reviewed the parol evidence simply out of courtesy to the lower courts, who relied upon it and made a contrary finding. We decide the case under the written contract. We conclude that Moossy is entitled under the contract to 7% of 75% of the last statement of the estimated project construction cost of $499,216.00 or $26,208.84. We reject plaintiff's claim for 4% of 75% of the cost for air conditioning. He apparently has abandoned this claim since he neither argued nor briefed it before this Court, and the record is devoid of any proof of this cost, although it is alleged in the petition that there was a low bid for $130,000 on this item. We also reject plaintiff's claim that his fee should be based upon the lowest bid received, since none of the bids were "acceptable" as required by the contract. The calculation of the architect's fee above is subject to a reduction of $5,250 previously received, and the total amount due is $20,958.84.
The judgments below are reversed.
It is ordered, adjudged and decreed that Huckabay Hospital, Inc. pay unto Louis E. Moossy the sum of $20,958.84, with interest at the rate of 5% from June 29, 1967 until paid. It is further ordered, adjudged and decreed that defendant's reconventional demands are denied and dismissed. Defendant, Huckabay Hospital, Inc. is cast for all costs in these proceedings.
Reversed and rendered.
SUMMERS, J., dissents and assigns reasons.
SANDERS, C. J., dissents for the reasons assigned by SUMMERS, J.
SUMMERS, Justice (dissenting).
I am filing this separate opinion as a dissent.
Huckabay Hospital, Inc., as owner, represented by Dr. Jackie D. Huckabay, of Coushatta, Louisiana, entered into a contract with Louis E. Moossy, a Shreveport architect, on January 13, 1966. The agreement was on the standard American Institute of Architects form incorporating a percentage basis for computing architectural fees, including engineering services. It set forth that the owner intended to erect a 40-bed hospital in Coushatta. In consideration of the architect's professional services, he was to be paid 7 percent of the project construction cost. Additional compensation was provided for air conditioning, work let under separate contract.
The contract also provided for the preparation of preliminary studies and drawings, working drawings and specifications, construction documents and the other usual services performed by an architect on such a project. Assisting the owner to obtain proposals from contractors and awarding and preparing construction contracts was recognized as part of these services.
A termination clause of the standard form was modified by the owner. The pertinent portion of the revision read:
1: The owner may terminate this contract at any stage by giving written notice to the Architect and thereafter the Architect will perform no further services.
2: In the event this contract is terminated, the Architect shall be paid only for such services as he has performed and for such obligations and expenses that he has incurred (including fees of engineers) to the date of termination. In the event such termination should come after completion of the preliminary studies the fee shall be as stated in the contract and should the termination be made after the completion of final plans and specifications the fee shall be as stated in the contract.
No reference to the cost limitation on the construction project was contained in *705 the contract. Another clause made it clear, however, that if the estimated project construction cost or the lowest bona fide proposal was in excess of the limit, the increase had to be approved by the owner in writing, or the owner must cooperate in revising the project scope or quality, or both, to reduce the cost.
Although the question is controverted, the record supports the finding of the trial judge and the Court of Appeal that Dr. Huckabay, who negotiated the contract with the architect Moossy, made it plain from the inception that the cost of the entire project must not exceed $350,000.
Payment to the architect was required by the contract to be made in three phases: upon completion of preliminary studies, 25 percent; when specifications and working drawings were made, a sum sufficient to bring the amount to 75 percent of the total fee; and, lastly, the balance during the course of construction, ending with a final payment upon completion.
Moossy began work on the plans. When the preliminary plans were completed Dr. Huckabay paid Moossy's March 31, 1966 statement for $5,250, which was the first phase or 25 percent required by the contract. As the planning proceeded, a first cost estimate of $442,486 was prepared by Moossy and submitted to Dr. Huckabay on June 10, 1966. Dr. Huckabay informed Moossy that this estimate was too high. But Moossy explained that at the proper time adjustments could be made to reduce the cost.
On September 12, 1966 Moossy submitted a second cost estimate for the project, this time for $499,210. Again Dr. Huckabay protested that the cost was too high, complaining that he could not finance such a project. After further changes and deletions, a $500,000 estimate was submitted in January 1967. Moossy persuaded Dr. Huckabay that though this figure was high such a presentation would be helpful in obtaining higher financing for the plan which would be ultimately agreed upon. He suggested that this estimate be submitted to the bank for its reaction.
Finally, on June 20, 1967 bids were invited and proposals received for the construction of a 42-bed hospital in accordance with final plans and specifications prepared by Moossy. Three valid bids were received: Sumrall Construction Co., $901,000; Southern Builders, Inc., $862,000; and McInnis Brothers, Inc., $821,018.
As the bids were patently in excess of the limitation contemplated by the agreement, a conference was held with McInnis Brothers, Inc., the contractor. The purpose of this conference was to make an effort to adjust the plans and specifications, and to reduce the cost in keeping with Dr. Huckabay's cost limitations. Moossy, his engineers, the McInnis representatives, and Dr. Huckabay attended. At the time Moossy indicated that if given an opportunity, he could, in two days, by changes and eliminations in the plans and specifications, reduce the costs by $349,000, well within a $500,000 cost the doctor could finance. Results of the conference were inconclusive, however, and shortly thereafter McInnis advised Dr. Huckabay that the plans and specifications could not be adapted to such a drastic reduction. Dr. Huckabay accordingly notified Moossy that he was terminating the contract.
Moossy then filed suit against Huckabay Hospital, Inc., claiming the fees prescribed by the contract based on the lowest bid of $821,018. In the alternative, he claimed that had Dr. Huckabay cooperated with him in reducing the project cost to $500,000, Moossy would, under the terms of the contract, be entitled to 75 percent of 7 percent of this latter construction cost, plus an additional sum equal to 75 percent of 4 percent of the cost of air conditioning, in all calculated to be $28,500, less a credit for the $5,250 received for preliminary plans.
Defendant Huckabay Hospital, Inc., denied any indebtedness under the contract to *706 Moossy, alleging that the plans and specifications prepared by Moossy were worthless, for they were not prepared in accordance with the contract and agreement. Huckabay Hospital, Inc., then reconvened for expenses incurred and loss of profits resulting from construction delays; and, in addition, for $5,250 the amount paid for the preliminary plans.
The trial judge denied both principal and reconventional demands. On appeal by both parties to the Second Circuit, the judgment denying Moossy's claim was affirmed. Huckabay Hospital's reconventional demand for expenses and loss of profits was also rejected; however, it was decreed entitled to $5,250, the fee paid for preliminary drawings. 266 So.2d 235. We granted certiorari on Moossy's application. 263 La. 91, 267 So.2d 206.
First, plaintiff urges that error was committed by the trial judge and Court of Appeal in holding that Dr. Huckabay set a cost limitation of $350,000 on the project.
Oral and documentary evidence was introduced at the trial to establish the understanding between the parties on the cost limitation. The procedure is not questioned, and I find it to be legally acceptable. It is an exception to the rule against receiving parol evidence to vary the terms of a written agreement. La.Civil Code art. 2276. Parol evidence is admissible under this exception to establish a collateral agreement which supplies an omission in a written contract. Rosenthal v. Gauthier, 224 La. 341, 69 So.2d 367 (1953). Only the conclusion reached by the trial and appellate courts is questioned.
Dr. Huckabay maintained that the contract contemplated a cost limitation very close to $350,000, the budget originally fixed by him. He testified that he told Moossy at the outset that the project cost must remain in keeping with that amount. Moossy attempted to contradict this position by showing that Dr. Huckabay continued to suggest additions to the plans and specifications even after the first estimate of $442,486 was submitted in June 1966. However, a careful study of the record convinces us that Dr. Huckabay's suggestions for design modifications and other changes made no reference to altering cost limitations, nor was such an inference warranted. The requests and suggestions were Dr. Huckabay's ideas of the needs the hospital should meet; they were not demands for changes regardless of cost. To the contrary, it is evident that Dr. Huckabay relied at all times upon Moossy to keep costs within the limits established in the beginning; it being at all times implicit in their negotiations that the plans would be worthless if they were for a hospital costing more than Dr. Huckabay could finance or more than he desired to spend. As I read the record, it was a principal object of the contract that it be kept within the cost limitations set by Dr. Huckabay.
As a general proposition, according to the expert testimony of one architect, and from the circumstance of such a case, an architect owes a duty to his client to keep the project within the cost limitation upon which the contract is based. Needless to say, construction cost is an integral part of any contract for architectural services. Rosenthal v. Gauthier, supra.
Moossy's March 1966 statement for $5,250 represented 25 percent of the total construction cost. This also supports Dr. Huckabay's position. Seven percent of $350,000 is $24,500 and 25 percent of $24,500 is $6,125. Hence, in March 1966 when Moossy calculated his entitlement to the preliminary plans payment based on 24 percent of the total fee, he must have used a total construction cost somewhat less than $350,000 in making his computation, for he arrived at a fee of $5,250.
Moossy's own testimony is to the effect that when he negotiated the contract with Dr. Huckabay, he represented that hospital costs would run about $10,000 per bed, or $400,000 for a 40-bed hospital. This evidence persuades me that Dr. Huckabay's version of the cost limitation is correct.
*707 Dr. Huckabay's understanding of the agreed cost limitations is, to some extent, further corroborated by the fact that after he notified Moossy that the contract between them was terminated, he proceeded to employ another architect. This architect did in fact design a hospital with room for 60 beds which was subsequently erected for $440,000.
These findings support my narrative of the facts to the effect that the parties did understand, at the time of the confection of the contract, that the agreement was made in contemplation of a cost limitation of $350,000 with some small allowance for adjustments.
An architect employed to prepare plans and specifications for a building, with the understanding that the construction would be accomplished within certain cost limitations, cannot recover compensation for his services where the building cannot be erected except at a cost materially in excess of the amount specified. MacDonnell v. Dreyfous, 144 La. 891, 81 So. 383 (1919); Williar v. Nagle, 109 Md. 75, 71 A. 427 (1908).
Clearly the lowest proposal, by McInnis Brothers, Inc., to build the hospital in accordance with the plans and specifications prepared by Moossy for $821,018 was "materially in excess" of the amount specified. Consequently, on the authority cited, the architect cannot recover.
But the architect contends he could have reduced the cost by $349,000 if Dr. Huckabay had cooperated in the effort as he was required to do by the contract. Aside from the fact that a $349,000 reduction would only reduce the cost to $472,000, an amount also materially in excess of the understood cost limitation, Moossy's representation that this could be done was unsupported by other evidence. To the contrary, McInnis, whose qualifications as a responsible contractor was recognized by all parties, stated categorically that the plans and specifications would not lend themselves to so substantial a reduction.
Where the disparity was so greatthe proposal being more than double the understood cost limitationDr. Huckabay cannot be charged with failing to cooperate by modifying the plans to reduce costs within the cost limitations he had set for the project. Especially is this true where Dr. Huckabay had, over a period of eighteen months, repeatedly admonished the architect that the cost estimates he submitted were excessive.
Only one question posed by this case remains unanswered. It concerns the interpretation of the termination clause quoted in the beginning of this opinion. It has been suggested that termination by the owner entitles the architect to be paid "for such services as he has performed ... to the date of termination." And if the "termination should come after completion of the preliminary studies the fee shall be as stated in the contract and should the termination be made after the completion of final plans and specifications the fee shall be as stated in the contract."
As I understand the contention, it is that any unilateral termination by the owner entitles the architect to the stipulated proportion of the fee. But I do not understand the contract that way. When, as in this case, the architect's performance violates an essential provision of the contract, such as cost limitations, he forfeits his claim to any fee whatever. Therefore, termination by the owner where such a violation has occurred is the assertion of a right to which he is entitled without paying any architect fees. This is not the termination contemplated by the quoted clause.
The quoted clause implies a situation in which the termination entitling the architect to a proportionate fee is a unilateral termination by the owner in the sense that neither the contract nor the architect's performance has provided a justifiable basis for the termination, a situation in which the proportion of the fee earned at the time must be paid. The quoted clause is *708 actually a formula devised to compensate the architect for work done when he is not at fault. The implied conditions for the application of the quoted clause have in fact not been satisfied here.
Huckabay Hospital, Inc., is entitled to an award of $5,250, the amount paid to Moossy, as prayed for in its reconventional demand; otherwise, the brief concedes that the claims under the reconventional demand are speculative and unsupported.
For these reasons, I respectfully dissent.