CHEHARDY, Judge.
This is a suit by S. Stewart Farnet, an architect, for the balance due for services rendered defendant, Frank Minyard, M.D. Defendant, as a defense, contends plaintiff’s renovation plans exceeded their verbal understanding that costs for renovation of defendant’s property would not exceed $50,-000. Plaintiff contends the verbally agreed-to ceiling on the renovation work was $100,000.
Suit was filed on December 12, 1977 and defendant reconvened for damages allegedly resulting from a loss of rentals in the building to be remodeled. The trial court rendered judgment in favor of the plaintiff in the sum of $6,039.49 together with legal interest from the date of judicial demand until paid and for all costs but dismissed the reconventional demand of defendant.
The.trial court found that appellant Dr. Minyard has failed to prove a limitation on *441 the cost of construction that had been agreed upon and that plaintiff can receive compensation for his services despite the cost of construction amounting to more than anticipated by defendant. The trial judge added that an architect has no obligation to inquire into or to keep himself , informed of his client’s financial status.
On September 17, 1975, plaintiff was retained to be the architect for renovation of a building owned by defendant at 718 Barracks Street in the Vieux Carre. The contract called for an architect’s fee of 10% of construction cost without mention of a cost limitation and was the standard owner-architect agreement prepared by the American Institute of Architects. It provided for five different stages of architectural services; schematic design phase, design development phase, construction documents phase, bidding or negotiation phase and construction phase.
Under the schematic design phase and the design development phase, the contract states that the architect shall submit to the owner a statement of probable construction cost based on current area, volume or other unit costs.
The contract also provides for certain percentages of the total fee to be paid at the end of each phase, with 80% of the fee due and owing upon completion of the bidding or negotiation phase.
This contract also covers additional services that an architect might or might not perform, and the principals of this contract agreed to a fixed rate of $35 an hour for those services. The contract further says that this fee will be subject to negotiation if the services of the agreement are not completed within 12 months of the date of the contract.
The pertinent provisions of the contract are:
“The rates and multiples set forth in this Paragraph lib will be subject to renegotiation if the services covered by this Agreement have not been completed within twelve (12) months of the date hereof.

ARTICLE 1
ARCHITECT’S SERVICES
* * * * * *
SCHEMATIC DESIGN PHASE
* * * * * *
1.1.3 The Architect shall submit to the Owner a Statement of Probable Construction Cost based on current area, volume or other unit costs.
DESIGN DEVELOPMENT PHASE
* * * * * *
1.1.5 The Architect shall submit to the Owner a further Statement of Probable Construction Cost.
CONSTRUCTION DOCUMENTS PHASE
* * * * sfc *
1.1.7 The Architect shall advise the Owner of any adjustments to previous Statements of Probable Construction Cost indicated by changes in requirements or general market conditions.
sfc # sfc * * $
ARTICLE 3
CONSTRUCTION COST
* * * * * $
3.5.1 If the lowest bona fide bid or negotiated proposal, the Detailed Cost Estimate or the Statement of Probable Construction Cost exceeds such fixed limit of Construction Cost (including the bidding contingency) established as a condition of this Agreement, the Owner shall (1) give written approval of an increase in such fixed limit, (2) authorize rebidding the Project within a reasonable time, or (3) cooperate in revising the Project scope and quality as required to reduce the Probable Construction Cost. In the case of (3) the Architect, without additional charge, shall modify the Drawings and Specifications as necessary to bring the Construction Cost within the fixed limit. The providing of such service shall be the *442 limit of the Architect’s responsibility in this regard, and having done so, the Architect shall be entitled to compensation in accordance with this Agreement.”
By November of' 1976 two bids had been received from contractors for the proposed •renovations, the lowest of which was for $99,960.66. It was at this time that defendant terminated the services of the architect.
Plaintiff claims, therefore, that at the time of the termination of his services 80% of the total was due in the amount of $8,039.49, less payments of $2,000 already made by Dr. Minyard. Defendant contends there was verbal agreement to hold the cost of construction to $50,000 and further verbal agreement that construction would begin by March 1, 1976. Defendant says that relying on this agreement he evicted tenants as of January of 1976, but received no bids until November 1976, resulting in extensive rental losses.
In the case of Kleinschmidt, Brassette & Associates v. Ayres, 368 So.2d 1153, 1155-56 (La.App. 3d Cir. 1979), the court said:
“An architect employed to prepare plans and specifications for a building, with the understanding that the construction would be accomplished within certain cost limitations, cannot recover compensation for his services when the building cannot be erected except at a cost materially in excess of the amount specified. MacDonnell v. Dreyfous, 144 La. 891, 81 So. 383 (1919); Tsoi v. Ebenezer Baptist Church, 153 So.2d 592 (La.App. 4th Cir. 1963); Rosenthal v. Gauthier, 224 La. 341, 69 So.2d 367 (1953).
“On the other hand, where an architect is employed to prepare plans and specifications for a building and there are no cost limitations agreed upon, such architect can recover compensation for his services irrespective of the costs of construction. Moossy v. Huckabay Hospital, Inc., 283 So.2d 699 (1973). Further, if no cost limitations are agreed upon, the architect has no obligation to inquire into or to keep himself informed of his client’s financial status. 6 C.J.S. § 28 Architects, p. 494; Guirey, Srnka & Arnold, Architects v. City of Phoenix, 9 Ariz.App. 70, 449 P.2d 306 (1969); Texas Delta Upsilon Foundation v. Fehr, 307 S.W.2d 124 (1957).”
Although there was no cost limitation in the contract before the trial court, testimony was allowed regarding the estimated cost of construction because of plaintiff’s obligation under the contract to furnish probable construction costs at various stages of his work.
The plaintiff produced office copies of several invoices which he testified were sent to Dr. Minyard periodically, and which noted that the estimated cost of construction would be $100,000. Although Dr. Min-yard could not recall having received notice of the projected cost at the time that the plaintiff said they were sent (as early as April of 1976) he had actually made two payments of $1,000 each during the period while the plaintiff was performing services under the contract. David Becnel, an architect and former associate of the plaintiff, gave the following testimony regarding cost limitation:
“Q Did you ever have an opportunity to meet with Dr. Minyard and Stewart Farnet relative to cost of the project?
“A Yes, I did. As a matter of fact the first meeting that I met with Mr. Farnet and Dr. Minyard with regard to costs was at the end of the design development phase. That phase more or less was a conclusion of the program requirements. From that point it would go into the construction document phase.
“Q Can you tell us the discussion, as far as cost, how that discussion went?
“A We reviewed the plans and Dr. Min-yard indicated that he spent $50,-000.00 on the project. At that point Mr. Farnet indicated the scope as revised from the preliminary drawings would cost $100,000.00, that there were no objections at the time. As a matter of fact Mr. Farnet and Dr. Minyard discussed the possibility of securing the additional $50,000.00 *443 including the refinancing of the property.
“Q Were there any subsequent discussions in your presence, let’s say subsequent to the time that bids were obtained, with Dr. Minyard relative to going forward or stopping the project?
“A No. Well, during the construction document phase we had to finalize and specify certain products that would go into the building. This included the kitchen cabinets, bathroom accessories and what not, and we met with him on a number of occasions specifying these things and we proceeded with the project and he was, I’m sure, aware of the cost of the project at that time because of our earlier meeting at the end of the development stage. During the-construction document phase we were proceeding on the basis that the budget was $100,000.00.
“Q How long do you think the construction document phase went on for?
“A I can’t recall. I think it was the spring of ’76 I believe was the beginning of the construction document phase and I think it ended in the fall, sometime in the fall. I’m not sure of the date.”
Mr. Farnet testified that early in their discussions he advised Dr. Minyard that he might expect to spend as much as $100,000 on the job; that an invoice mailed to Dr. Minyard on April 1, 1976 set forth a progress payment and stated that estimated costs would be $100,000; that in discussions subsequent to April 1, 1976 he also advised Dr. Minyard that the cost of the work anticipated by Dr. Minyard would be $100,000; that in addition to preparing plans he had the responsibility to see that the building would be approved for issuance of the permit by the Vieux Carre Commission and that this caused delays.
There is testimony and evidence in the record that Dr. Minyard sent $2,000 to plaintiff in payment of invoices for work performed by plaintiff under the contract and that defendant made attempts to borrow money. Defendant also testified that he never intended to spend in excess of $50,000 and repeatedly told plaintiff he could not borrow or spend more than $50,-000. Defendant further said he had not agreed to construction costs of $100,000.
In the case of Moossy v. Huckabay Hospital, Inc., 283 So.2d 699 (La.1973), the Court was also presented with a contract for architectural services which contained no cost limitation. In that case, the fee was based on a percentage of the estimated project cost, but the bids received were almost double that of the estimate by the architect, and the Court awarded the contract percentage of the estimated cost.
In the present case, however, no such problem presents itself. The trial court concluded that estimated cost was, apparently, $100,000, and the record establishes that the lowest bid received was for almost this identical amount.
In regard to the issue of the portion of the contract requiring renegotiation of fees when the work has not been completed within one year of the contract, the weight of the testimony of all of the experts was that this portion of the contract, drawn up generally to favor the architect, was to protect the architect from inflationary rises in costs beyond projected estimates. This is an issue, once again, not involved in the present case, and the fact that fees were not renegotiated does not render the plaintiff in noncompliance with the contract. Moreover, a reading of the contract indicates that this paragraph applied only to the optional architectural services listed under another section of the contract and for which the parties had agreed on a fee of $35 an hour.
The trial judge faced with contradictory testimony relative to the amount to be spent on the renovations determined that plaintiff had proven his case — a determination which, under Louisiana jurisprudence, we are bound by unless we find manifest error in the trial court’s findings.
*444 Considering the record in its entirety we find that the trial court did not abuse its much discretion and certainly was not clearly wrong in concluding that plaintiff had satisfied his obligation under the contract and that there was not an understanding between plaintiff and defendant to limit costs of remodeling to $50,000.
The trial court also concluded that defendant had not proven his reconventional demand for rent losses caused by his evicting tenants in' anticipation of renovation work at the Barracks Street property. Defendant evicted his tenants as of January 1976. In view of certain understandings still to be finalized with the Vieux Carre Commission at that time, this action by defendant was premature. We agree with the trial court that the evidence does not support a finding that plaintiff is at fault for defendant’s rent losses. We therefore find that the trial judge properly denied defendant’s reconventional demand.
The judgment of the trial court is affirmed in all respects.

AFFIRMED.