480 So.2d 772 (1985)
WILLIAMS ENGINEERING, INC.
v.
David GOODYEAR, Andrew Goodyear, Bart LaRocca, John Leyens and Frank Friedler, Jr.
WILLIAMS ENGINEERING, INC.
v.
WATER MAZE, LTD., David Goodyear, Andrew Goodyear, Bart LaRocca and Frank Friedler, Jr.
Nos. 85-CA-206, 85-CA-207.
Court of Appeal of Louisiana, Fifth Circuit.
October 10, 1985.
Rehearing Denied January 17, 1986.
*773 Robert E. Leake, Jr., Lawrence A. Mann, Hammett, Leake & Hammett, New Orleans, for plaintiff-appellee.
Russ M. Herman, Steven J. Lane, Herman, Herman, Katz & Cotlar, New Orleans, for defendants-appellants.
Before KLIEBERT, CURRAULT, JR. and GAUDIN, JJ.
CURRAULT, Judge.
This appeal arises from a jury verdict pursuant to a suit for professional engineering fees and a reconventional demand for breach of contract. The jury returned a verdict in favor of plaintiff, Williams Engineering, Inc. (Williams) and against defendants, David Goodyear, Andrew Goodyear, Bart LaRocca, John Leyens and Frank Friedler, Jr. (the "owners") on the main demand. On the reconventional demand, *774 the jury verdict found in favor of the plaintiffs-in-reconvention (the "owners") and against defendant-in-reconvention, Williams.
The facts of the case reveal that in November, 1978, Robert M. Williams, a civil engineer and owner of plaintiff company, was contacted by David Goodyear regarding the use of Williams's services to build a water slide facility. Williams was recommended to Goodyear by Southbend Construction Company (Southbend) who Goodyear had occasion to meet with previously regarding an unrelated matter.
As the bulk of water slide business occurs during summer months when schools are out, the investors were anxious to begin operation by mid-May or early June. Thereafter a meeting between Williams, David Goodyear, Mr. Graham and Mr. Douglas of Southbend was held. At that time no lease had been acquired for the location of the project. A second meeting was held in December, 1978 to discuss Williams's fees, etc., after which Williams sent a professional services contract and letter to Goodyear for approval and signatures of the project investors. The contract provided for the engineer's services to be broken down into several separate phases. Each phase was to be completed and approved prior to the commencement of the next phase.
On January 10, 1979, the owners executed a lease on property on which to construct the water slide; and on January 19, 1979, the Williams contract was signed by the investors.
A third meeting was held on February 8, 1979 between Williams, David Goodyear, Bart LaRocca and John Leyens to determine a rough estimate of the cost of the project and to discuss the feasibility of opening the water slide by the beginning of the summer season. Williams presented a preliminary estimate which was understood by all parties to be unreliable at that stage due to a lack of drawings, surveys, etc. The estimate was in the amount of Four Hundred Nine Thousand Three Hundred Dollars ($409,300). Since the Goodyear group was anxious to complete the project by mid-May or June 1, and the normal method under the contract would take too long, the parties also agreed to convert the project from the normal phase-by-phase design, development and construction method to a "concurrent design construct" or "fast track" method. The "fast track" method required that the designing, drawing and construction of the project would be done concurrently rather than on a phase-byphase basis. The change was made orally and no written amendments were made to the original Williams contract.
In this regard, Williams suggested a cost-plus contract for the contractor chosen to build the project in order to get the project completed as fast as possible and in light of the fact that the contractor would not have the drawings and specifications necessary for bidding. Williams suggested Southbend, whom he believed to be honest based on some business dealings with them in the past. There was also some discussion regarding the estimated cost of the project being higher than expected, but nevertheless the parties agreed to go forward. David Goodyear subsequently contacted Southbend and a meeting was held on February 12, 1979. Thereafter a proposal was submitted, accepted and incorporated into a formal contractor's cost-plus contract prepared by Williams as agreed upon. The Southbend contract was executed on March 2, 1979 by the "owners" and on March 6, 1979 by Southbend. Construction began immediately thereafter and the water slide facility was opened on August 4, 1979.
During the period of construction, Williams invoiced the owners according to the method described in the Williams's contract. Williams's fee, according to the contract, was to be initially computed on Williams's opinion of the net construction cost, times the percentage rate, which was to be determined from a curve based on the complexity of a project. However, the contract formulated on the phase-by-phase basis, envisioned varying net construction costs as the project progressed with Williams to *775 ultimately receive a percentage of the actual construction costs. The net construction cost actually utilized by Williams remained the same amount of $409,300 which was initially projected as the costs by Williams. That figure was not further updated during the progress of the project since no further estimates were prepared. During the construction, Williams was paid approximately Forty Thousand Dollars ($40,000).
After the slide was opened in August, 1979, the owners were presented with an actual cost of the slide of Eight Hundred Thirty Thousand Dollars ($830,000) and the final actual cost was in excess of Nine Hundred Ninety Thousand Dollars ($990,000).
The owners then refused to pay Williams Thirty-Six Thousand One Hundred Forty-Four Dollars ($36,144) owed on the final actual costs; and on December 4, 1979, Williams filed suit to collect the remaining portion of the fee. The owners reconvened against Williams and his insurer, American Motorist Insurance Company, for breach of contract.
Jury trial of the matter was held December 1 through December 9, 1983. On the main demand, the jury awarded Williams a fee of Twenty-Five Thousand Dollars ($25,000) plus attorney fees in the amount of Twenty-Three Thousand Dollars ($23,000); expert witness fees totalling Five Thousand Nine Hundred Twenty-Five Dollars ($5,925); litigation expenses of Two Thousand Eight Hundred Dollars ($2,800); and court costs. On the reconventional demand, Williams was found to have breached the contract and the owners were awarded One Hundred Twenty-Five Thousand Dollars ($125,000) plus expert fees totalling Three Thousand Dollars ($3,000) and court costs.
Thereafter both Williams and the owners perfected appeals of the jury verdict.
Appellants, David Goodyear, Andrew Goodyear et al and Watermaze, Ltd., assert the following as error:
that (1) the jury erred in awarding appellee, Williams Engineering, Inc. $25,000 professional fees; $23,000 attorney's fees' and $7,725 expert fees and costs in that an engineer is not entitled to compensation when he breaches the terms and conditions of his construction contract with the owners for whom he is agent; and that
(2) the jury erred in awarding appellants, Bart LaRocca, Frank Friedler, Jr., Andrew Goodyear, David Goodyear, Mrs. John Leyens[1] and Watermaze, Ltd., only damages for $125,000, in that a party to a construction contract is entitled to recover damages for any and all incidental damages and/or excess costs arising from the engineer's negligent and/or bad faith violation of his contractual duties.
Cross-appellant, Williams Engineering, Inc., asserts the following as error:
that (1) the jury erred in failing to award Williams its full professional fee; that
(2) the court erred in instructing the jury regarding the law as it applies to Williams's claim for its fee; that
(3) the jury's determination that Williams breached its contract with the Goodyear/Waterslide group was erroneous and contrary to the evidence produced at trial; that
(4) the court erred in instructing the jury with respect to the law on the owners' claim for breach of contract and damages; and that
(5) the court erred in granting a directed verdict in favor of the Goodyear/Waterslide Group with respect to Williams's claim for "cost of collection" with regard to the salary expenses of Robert M. Williams and Norma Nobile.
BREACH OF CONTRACT
In order to dispose of the issues in a systematic manner, the issue of Williams's breach of contract must necessarily be addressed first.
Cross-appellant, Williams, argues that because the project was converted to a fast-track method of construction, the portions *776 of the original contract requiring updated estimates also became ineffective.
While the jury found that Williams breached the written contract, they did not find Williams to have done so in bad faith. Cross-appellant, Williams, argues that the jury was charged incorrectly in regard to the breach.
In reviewing the law in this respect, and the jury charges, it is apparent that insofar as the charges related to a written contract, and bad faith breach of contract, the jury was charged correctly. However, the jury was not charged as to effect of subsequent oral modification of a written agreement, the failure of which was objected to by Williams. Since this case clearly involves a subsequent oral modification of a written contract, that failure is error and brings the issue of the breach before the appellate court de novo.
A contract is the law between the parties. LSA-C.C. art. 1901. The obligation extends not only to what is expressly stipulated, but everything that by law, equity or custom is considered incidental to the contract or necessary to carry it into effect. LSA-C.C. art. 1903. Further, it is well established that a person signing a written instrument is presumed to know its contents whether or not he failed to read it or have it explained. Smith v. Leger, 439 So.2d 1203 (La.App. 1st Cir.1983).
On the other hand, contracts may be modified, abrogated or nullified by mutual consent. Dejoie v. Roussell, 447 So.2d 104 (La.App. 4th Cir.1984); Ed Bulliard Company, Inc. v. Foretich  Zimmer Construction Company, Inc., 451 So.2d 29 (La.App. 3d Cir.1984), writ den. 456 So.2d 169 (La.1984). Furthermore, a written contract may be modified orally subsequent to execution of the written instrument. Maryland Casualty Company and Southern Equipment, Inc. v. Watson Marine Repair & Cleaning Service, Inc., 416 So.2d 194 (La.App. 1st Cir.1982) writ den. 421 So.2d 249 (La.1982); Campagna v. Smallwood, 428 So.2d 1343 (La.App. 4th Cir. 1983). Modification can be presumed by silence, inaction or implication. Bank of Louisiana in New Orleans v. Campbell, 329 So.2d 235 (La.App. 4th Cir.1976) writ den. 332 So.2d 866 (La.1976), LSA-C.C. art. 1811, LSA-C.C. art. 1816; LSA-C.C. art. 1817.
In regard to damages for breach of a contract, LSA-C.C. art. 1934 provides:
"Art. 1934. Measure of damages for breach of contract
"Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:
1. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. By bad faith in this and the next rule, is not meant the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will. (Emphasis added)
The facts reveal that the Williams written contract contemplated an orderly phase-by-phase method of services consisting of:
(1) scope and concept phase
(2) preliminary design phase
(3) design development phase
(4) contract document phase
(5) bidding or negotiating phase
(6) construction phase.
During the progress of the project, the contract obligated Williams to provide updated estimates through the contract or document phase, based on which the owners could decide to continue or abort the project. These estimates were due until the construction phase commenced. During construction, his duty was to oversee the implementation of the contract documents; (the drawings, specifications, etc.) advise and consult with the owner; issue instructions to the contractor when authorized *777 by the owner; review the contractor's invoices and approve payments; make recommendation relating to the execution and progress of the work; notify the owner if anything was nonconforming to the contract documents; review shop drawings, samples, etc. for general conformance to the design concept; prepare change orders for owner's approval; conduct construction progress reviews relative to date of completion and issue to owner a certificate of final payment after notice of completion was filed by the owner.
At the end of each phase, Williams was to earn a percentage of his total fee and Williams was to be paid as follows:
"6.3 BASIC SERVICES FEE BASED ON PERCENTAGE OF NET CONSTRUCTION COST
"When the Agreement stipulates that the OWNER shall pay WILLIAMS for Basic Services performed under Article 1 pursuant to a percentage of the Net Construction Cost, the fee shall be initially computed on WILLIAMS' Opinion of the Net Construction Cost times the percentage rate which is to be determined from the curve specified in the Agreement. During the progress of the service, WILLIAMS' fee shall be adjusted by similar computations using revised Opinions of the Net Construction Cost prepared during the various phases and, finally, at the conclusion of the services, by computations based on the actual Net Construction Cost of the PROJECT to OWNER."[2]
(Emphasis added)
However, after the agreement was executed, the parties agreed to revert to a "fast-track" method because the owners were in a great hurry to open the water slide. A change to this method meant that instead of performing his services on a phase-by-phase basis, the phases of the project were compressed. Construction began immediately upon the contractor's receipt of the engineer's drawings, etc. In effect, both the construction and engineer's services were ongoing at the same time and bidding negotiations were eliminated. In order to facilitate this end, the parties also agreed to the more expensive cost-plus method of construction in which no maximum limit was set. The engineer, Williams, recommended the cost-plus contract claiming that it was the only feasible construction contract a contractor would accept under severe time limitations.
During the progress of the project, the evidence shows that Williams performed in all respects except as to giving revised cost estimates. He did however perform a detailed review of the contractor's invoices before certifying their correctness and forwarding those invoices to the owners. He and his experts asserted that because the project was orally modified to a "fasttrack" method of construction, his obligation to provide continuous updates on costs was not applicable. Mr. Graham of Southbend, the contractor who also testified, agreed that updates were not feasible *778 because of the rush to complete the job. Williams had asked for a progress schedule in May, but the contractor failed to provide it. The contractor stated it was not possible to provide the progress schedule because of the hurried nature of the job.
In April, 1979, Williams admitted that the drawings and designs were substantially complete. The owners' expert testified that Williams should have revised the estimate at that point and that his failure to do so was a breach of the contract. He also testified that Williams should have offered the owners alternatives to the cost-plus construction contract, i.e., cost-plus with a maximum ceiling or renegotiation of the contractor's contract after the plans were substantially complete. Williams's experts, however, testified that due to the nature of the job and the emphasis on time, the alternatives suggested were impractical as bidding, necessarily part of those alternatives, would unduly delay the project. Williams also testified that at one point prior to substantial completion of the plans in April, he asked Goodyear whether or not to continue with the plans or revise the estimate. He states he was told to continue with the plans as time was of the essence. This allegation was denied by David Goodyear.
The owners admitted that at no time did they request an update on costs. However, the testimony of David Goodyear and LaRocca indicated that they were relying on the invoices for Williams's fee which continued to utilize the original and admittedly unreliable net construction cost estimate of $409,300. They admitted receiving the contractor's bills which they paid promptly, but denied that those documents notified them that the job costs would ultimately increase to some amount greatly in excess of the original estimate.
The first billings from the contractor approved by Williams for the period ending April 3rd for work performed to date totalled Thirty-Five Thousand Nine Hundred Eighty-Eight Dollars and Six Cents ($35,988.06) of that amount Thirty-Two Thousand Three Hundred Eighty-Nine Dollars and Twenty-Five Cents ($32,389.25) was paid, a portion being retained. The fourth billing for the period ending June 30, 1979 for work performed to date totalled Three Hundred Eighty-Six Thousand Dollars Seven Hundred Eighty-Six Dollars and Thirty-Seven Cents ($386,786.37) of which One Hundred Eighty-Five Thousand One Hundred Twenty-One Dollars and Seventy-Four Cents ($185,121.74) had been paid between the first and fourth bill. After subtracting the amount retained and the previous payments, the amount paid was One Hundred Sixty-Two Thousand Nine Hundred Eighty-Five Dollars and Ninety-Nine Cents ($162,985.99). Thus, sometime in July, the parties were on notice that the project would cost more than the estimated net construction cost of Four Hundred Nine Thousand Three Hundred Dollars ($409,300).
David Goodyear testified however that while he was aware on July 19, 1979 that the project was going to cost more than the original estimate, he and the others were expecting the project to cost no more than 15 percent over and above the $409,300. Both Williams and the owners expressed shock that the next bill received after opening on August 4, 1979 indicated an actual cost of more than double the estimated cost.
Our review of the evidence in this case convinces the court that the parties were operating under a misunderstanding as to the effect of the oral modification on the duty of Williams to revise the estimate. Since there was no discussion or agreement regarding the affect on the contractual obligation to revise, we must conclude that there was no meeting of the minds and thus no oral modification of the contract in regard to the revised updates. Furthermore, the Louisiana Civil Code provides that in a doubtful case the agreement is interpreted against him who has contracted the obligation. LSA-C.C. art. 1957. Since Robert Williams is the expert and also drew up both contracts, it is our opinion that he had a duty to clarify the effect of the oral change on the written contract terms.
*779 Returning to the first issue presented by the appellant-owners, it is argued that Williams's breach of the professional services contract constitutes a bar to his recovery of any amounts.
In this regard, the jury interrogatories found Williams to be entitled to a fee over and above that amount he collected during the project, but awarded only Twenty-Five Thousand Dollars ($25,000) as opposed to Williams's request for Thirty-Six Thousand One Hundred Forty-Four Dollars ($36,144). The jury also awarded Williams Twenty-Three Thousand Dollars ($23,000) in attorney fees, and Seven Thousand Seven Hundred Twenty-Five Dollars ($7,725) expert fees and costs.
On the other hand, cross-appellant, Williams, argues that the entire fee should have been awarded under the contract terms, citing Kleinschmidt, Brassette and Associates v. Ayres, 368 So.2d 1153 (La. App. 3d Cir.1979) for the proposition that a professional fee is due when the contract does not provide for a cost limitation. In this case, neither the Williams contract nor the Southbend contract expressed a cost limitation. Williams also argues that the judge erroneously charged the jury by failing to cite Kleinschmidt.
The law in Louisiana provides that an engineer is entitled to his fee where cost limitations have not been agreed upon. Kleinschmidt, Brassette and Associates v. Ayres, supra; Moossy v. Huckabay Hospital, 283 So.2d 699 (La.1973). However both Kleinschmidt and Moossy involve the question of whether or not a cost limitation was part of the agreement of the parties. In Kleinschmidt, the entire agreement was oral and Moossy involved a written contract with allegations of subsequent oral modification related to the cost limitation. That is not the issue in this case. Here we are concerned with the right of the engineer to collect a fee when he has breached the contract by failing to give revised estimates. It is undisputed that there was no cost limitation in the agreements.
While we find no case directly on point, analogous jurisprudence holds that a contractor who substantially performs a construction contract is only entitled to the contract price, less damages, attributable to the contractor's breach of contract. Gibbens Pools, Inc. v. Corrington, 446 So.2d 420 (La.App. 4th Cir.1984) writ den. 447 So.2d 1070 (La.1984). In Weeden Engineering Corp. v. Hale, 435 So.2d 1158 (La.App. 3d Cir.1983), the court affirmed the trial court ruling that reduced the engineer's fee for services rendered to an attorney in a suit where some of the work was performed in accordance with the attorney's request, but the tests were inadmissible in that they were conducted on the wrong type of material.
In our opinion, the reduction approach is an appropriate and just method of determining the issue. Further, as Kleinschmidt does not apply to these facts, we do not find that the jury was incorrectly charged.
The record reveals that Robert Williams was paid Four Thousand Dollars ($4,000) for the original estimate plus Forty Thousand Three Hundred Eleven Dollars ($40,311) in fees from the beginning of the project until the water slide was opened in August. During this period his fee was calculated on the $409,300 estimate. The portion he seeks to recover here is based on the final construction costs, as provided for in the contract. The final cost of construction totalled Nine Hundred Eighty-Eight Thousand Nine Hundred Eighty-Five Dollars ($988,985) per his invoice of January 1, 1983, or Five Hundred Seventy-Nine Thousand Six Hundred Eighty-Five Dollars ($579,685) in excess of the figure used during the construction.
As stated previously, Williams, having completed the necessary documents in April, 1979, was in a position to revise the estimate or at the very least to question the owners as to whether they wanted an update. Because of his failure to do so, which constituted a breach of the contract, we find that the jury was manifestly erroneous in its award and that he is entitled to no further compensation for his services *780 above the amount he has long since recovered. It follows that the award of attorney fees, expert and other costs were also erroneously awarded. Consequently, this portion of the judgment must be reversed and Williams's claim for cost of collection must be denied.
The next error asserted by the "owners" is whether the jury failed to award the proper amount of damages. Appellants argue that they are entitled to recover damages for any and all incidental damages and/or excess costs arising from the engineer's negligence and/or bad faith violation of his contractual duties.
LSA-C.C. Article 1935 provides that damages due to the creditor for a breach of contract are the amount of loss he has sustained, and the profit of which he has been deprived. However when debtor is guilty of no fraud or bad faith, he is liable only for such damages as were contemplated by the parties. Bad faith, as defined by the Louisiana Civil Code, is a designed breach from some motive of interest or ill will, not merely the breach of faith in not complying with the contract.
The jury, in interrogatories, specifically found that Williams did not act in bad faith and we find no manifest error in this regard. However, we find erroneous the jury award of One Hundred Twenty-Five Thousand Dollars ($125,000) in damages for the breach based on the evidence.
Appellant-owners are asking for a total recovery of Two Hundred Fifty-Six Thousand Dollars ($256,000) plus Fifteen Thousand Dollars ($15,000) court costs and Forty Thousand Dollars ($40,000) legal fees. The damage demand is based upon the expert testimony of J. Fred Woessner who was qualified as an expert certified public accountant to testify as to the extent and amount of damages suffered by the owners.
Based upon the checks and payments to Southbend, checks and payments to suppliers of materials, and the checks that were paid by the owners to various entities from the inception of the facility until its having closed for business on a permanent basis, the total cost of construction was Eight Hundred Twenty-Four Thousand Nine Hundred Thirty-Four Dollars ($824,934). From this amount was subtracted the Forty Thousand Three Hundred Eleven Dollars ($40,311) that Williams had previously been paid by the owners as his fee. Woessner next subtracted the $409,300 cost estimate from Seven Hundred Eighty-Four Thousand Six Hundred Twenty-Three Dollars ($784,623). The remaining Three Hundred Seventy-Five Thousand Three Hundred Twenty-Three ($375,323) was calculated by Woessner as being the excess costs of construction.
In that the individuals realized tax losses to their benefit in the amount of One Hundred Nineteen Thousand Dollars ($119,000), the actual out-of-pocket losses to the owners was Three Hundred Thirteen Thousand Dollars ($313,000). Having computed the losses of the group as a whole, Woessner then determined their losses as individuals, which resulted in a lesser total excess damage figure of Two Hundred Fifty-Six Thousand Dollars ($256,000) and Fifteen Thousand Dollars ($15,000) in court costs and Forty Thousand Dollars ($40,000) in attorney's fees.
In reviewing the record, testimony of LaRocca and Goodyear revealed that the "owners" knew the estimate was not guaranteed. However, it was not until July, 1978 that they expected the costs to exceed the estimate by approximately 15 percent. At that time the invoices indicated 85 percent completion at $409,300. Thus, the proper base figure upon which to calculate the costs should have been Four Hundred Seventy Thousand Six Hundred Ninety-Five Dollars ($470,695) instead of Four Hundred Nine Thousand Three Hundred Dollars ($409,300) used by appellantowners' expert witness. We therefore recalculated the total using the proper base figure, but in the same manner as Woessner without individualizing the losses. In this manner we find the evidence reflects that appellants are entitled to Two Hundred Four Thousand Nine Hundred TwentyEight *781 Dollars ($204,928) or Seventy-Nine Thousand Nine Hundred Twenty-Eight Dollars ($79,928) more than awarded by the jury. However, when the debtor has been guilty of no fraud or bad faith, as we have found herein, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. It has long been established that attorney fees are recoverable only where allowed by statute or provided for by contract. Thus, as neither the law nor the contract provides for attorney fees in this case, that item is disallowed. On the other hand, the appellants' court costs of Fifteen Thousand Dollars ($15,000) were stipulated at trial and they are entitled to recover those amounts.
Therefore, after a review of the law and evidence, we hereby reverse the judgment on the main demand, affirm and amend the judgment as to the reconventional demand, increasing the award to Two Hundred Four Thousand Nine Hundred Twenty-Eight Dollars ($204,928) plus Fifteen Thousand Dollars ($15,000) in costs. Costs of this appeal are to be divided by the parties.
REVERSED IN PART; AMENDED IN PART; AND AFFIRMED AS AMENDED.
NOTES
[1] Mr. Leyens was deceased at time of trial.
[2] DEFINITION  NET CONSTRUCTION COST

Net Construction Cost includes the costs of all labor, materials, equipment, and specified furnishings and shall be determined as follows: For completed construction, the actual total cost to the Owner of all such construction work which had been designed or specified by the Engineer; for construction work or equipment or furnishings designed or specified by the Engineer but not actually constructed or furnished, the lowest bona fide bid received from a qualified bidder for any or all of the work, or; for work for which bids were not received, the Engineer's latest Opinion of their cost; Construction Cost does not include the fees of the Engineer or any other consultant, the cost of land, or other costs which are the responsibilities of the Owner; labor furnished by the Owner for the construction shall be included in the Net Construction Cost at current local AFL/CIO rates including all applicable payroll taxes and similar payroll surcharges and including not less than 30% added for overhead and profit equivalents. Materials and equipment furnished by the Owner shall also be included in the Net Construction Cost at current market rates FOB project site, except that used materials and equipment shall be included as if purchased new at their new cost, all with not less than 30% added for overhead and profit equivalents. In instances where the Owner furnishes either labor or materials or other services himself, he agrees to maintain adequate material cost and labor "hours worked" records for all labor classifications.