436 So.2d 1223 (1983)
DASPIT BROS. MARINE DIVERS, INC.
v.
LIONEL J. FAVRET CONSTRUCTION CO.
STAR MANUFACTURING CO. OF OKLAHOMA
v.
LIONEL J. FAVRET CONSTRUCTION CO.
Nos. 5-155, 5-156.
Court of Appeal of Louisiana, Fifth Circuit.
June 28, 1983.
Rehearing Denied September 16, 1983.
*1224 Clarence F. Favret, Jr., and Gregory J. Favret, New Orleans, for Lionel J. Favret Construction Co., Inc., Defendant-Appellant.
Evangeline M. Vavrick, New Orleans, for Daspit Bros. Marine Divers, Inc., Plaintiff/Defendant in Reconvention/Appellant.
William R. Mullins, Baton Rouge, for Star Manufacturing Co., Plaintiff-Appellee.
Before BOUTALL, BOWES and CURRAULT, JJ.
BOUTALL, Judge.
This is an appeal from a judgment in a construction contract suit, for defects in the construction of a prefabricated steel building and slab intended for use as a heavy industrial machine shop and office.
Daspit Brothers Marine Divers, Inc. (Daspit) filed suit against Lionel J. Favret Construction Co., Inc. (Favret) and later amended to add as defendant Star Manufacturing Company of Oklahoma (Star), manufacturer of the steel building. Favret reconvened against Daspit for moneys due on the contract and third-partied Star for indemnification in the event Favret was found liable. Star sued Favret for moneys due on an open account for materials furnished to the job. The two cases were consolidated for trial.
The court found in favor of Daspit and against Favret in the amount of $24,131 on the principal demand. On the reconventional demand, the court found in favor of Favret and against Daspit in the amount of $24,302. On the third party demand the court found in favor of Favret and against Star in the amount of $5,425. On Star's demand against Favret, the court found in favor of Star, awarding $70,070.17, subject to a $25,000 credit plus attorney's fees of $2500.
In his Reasons for Judgment the trial judge adopted the findings of the court-appointed expert, Larry Case, AIA, as to the facts. He stated he based the valuation of items of dispute, listed as # 1 through # 37, upon reports by Arthur L. Dahlman, a construction estimator hired by Daspit and by Joseph Fulco, an architect, also hired by Daspit, and upon testimony presented at trial. Both Favret and Daspit have appealed. Favret has paid Star.

ERRORS
The plaintiff, Daspit, specified seven errors: valuation of items to be corrected; finding the slab to be adequate; disregarding the problem with the skylight configuration; failing to consider all the contract documents as the total contract; failing to allow damages for substituting overhead sliding doors for rolled doors; failing to allow testimony or to award damages for business losses and finding substantial completion resulting in an award to Favret of the balance due on the contract.
Favret agrees with the court's findings of fact, but appeals the assigned valuation of corrections and the denial of its claim for *1225 delay damages and expenses and for additional erection costs.

FACTS
To help clarify the dispute between Daspit, Favret, and Star, a more detailed recital of facts is necessary.
Favret is a franchise dealer for Star. A Favret sales representative, Louis Negrotto, called on Ronald Daspit at his place of business to determine his requirements for a prefabricated steel building. Daspit is in the business of making products for submarine pipeline repair and equipment incidental to marine diving. Heavy machines, the largest one weighing 47,000 pounds, are used to manufacture these products. The new building was planned with a view to expansion and was to include areas for offices, a warehouse, and a plant in which an overhead crane could be installed.
Star designed a building from prefabricated components and furnished to Favret an "engineering package" that gave information on the weight the building imposes on the foundation. This Favret forwarded to Sam Z. Scandaliato, a civil engineer, for design of a slab foundation. Favret informed him it was to be a heavy industrial facility. Scandaliato had soil borings made to classify the soil under the site and his assistant made an on-site inspection of Daspit's old facility to bring back information necessary for the design. An agreement was signed by Ronald Daspit and Lionel Favret, Jr. in April, 1977 for purchase and installation of the building at a cost of $95,052. Construction began in July. Favret had two crews, which performed separate functions. An erection crew under the direction of the erection superintendent put up the prefabricated steel frame. The general contract superintendent and his crew handled the concrete, carpentry, and other phases of the building. Additional subcontractors were called in for masonry, plumbing, heating and air conditioning, and electrical work.
In addition to the contract, three sets of drawings were made and were introduced into evidence at trial: S-6, erection drawings furnished by Star and used by the erection foreman on the job; S-4, a three-page set of drawings made by Scandaliato and submitted for the building permit; and D-1, a 2-page set of construction drawings of which copies allegedly were given by Favret to Ronald Daspit and to Richard Owens, the contract superintendent. After the record was received by this court, it was discovered that S-6 and D-1 were missing from the box of exhibits. The parties have not as yet been able to provide the court with copies.
Daspit paid an initial deposit of $9,500 and then made three payments amounting to $70,259.71. It refused to make further payments, leaving a balance of $24,302 due on the contract, after which Favret stopped work on the project. Daspit filed this suit on September 16, 1978. At time of trial, Ronald Daspit had done some patching of the roof himself, had moved small machinery into the building and had occupied it several weeks. The heavier machinery operation remained in the old building.
Two of the complaints viewed by the plaintiff as most serious, the installation of overhead sliding doors instead of roll-up doors, and the placement of skylights, stem from a conflict between the written agreement (herein referred to as "contract") and the Scandaliato plans. Plaintiff asserts that the overhead doors would make it difficult for him to install and use an overhead crane, as the doors lower the available ceiling height. The Scandaliato plans specified roll-up doors, while the contract provided sliding doors. According to plaintiff's brief the drawings given to the construction foreman, now missing, specified roll-up doors. As to the skylights, the plaintiff complains that they are not placed according to his specifications. The present configuration provides insufficient natural light for machinery work and will increase the plaintiff's energy expense. Both of these issues, as well as some others, depend upon what documents constituted the building contract between the parties.

*1226 CONTRACT
This case falls into the category of building contracts and the responsibility of a contractor is set out by Louisiana Civil Code articles 2762 and 2769, which read as follows:
"Article 2762.
If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks.
"Article 2769.
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract."
The court in Nichols Ford Company, Inc. v. Hughes, 292 So.2d 345 (La.App. 2nd Cir. 1974) interpreted these articles as follows, at 346:
"... It is implicit in every building contract that the work of the builder be performed in a good, workmanlike manner, free from defects either in materials or workmanship. An owner seeking to recover from the contractor has the burden of proving both the existence and nature of the defects, that the defects are due to faulty materials or workmanship and the cost of repairing the defects...."
The contract signed by Ronald Daspit and Lionel Favret, Jr. on April 27, 1977 was an eight-page proposal, outlining the services to be provided and described the building to be ordered from Star. The completion date, weather permitting, was July 31, 1977. No plans or specifications were attached, but reference was made to plans, as follows. In the section entitled "Scope of Work," Favret includes in the price "such drawings as are required for construction purposes." In "Concrete," the contract refers to "the anchor bolt setting plan." Such a diagram appears on page 1 of S-4, the Scandaliato drawings. In "Carpentry," appears the statement, "Interior side of steel building walls in finished spaces and interior partitions shown on the plans shall be 8' high...." The Scandaliato drawings show interior partitions in the office area on page 2. Under "Allowances," the contract states, "When exact requirements are known and plans and specifications are issued the contractor shall take bids on the separate phases of the work to determine the exact price of each item." Under "Metal Building and Accessories," the contract states, "Star Manufacturing Company shall have on file complete design calculations of all structural components on your building and shall furnish same upon request." In addition, the following statement appears: "This building and all accessories and other work described herein will be installed according to Star Standard Erection Plans and Specifications...." Above the dates and signatures on the final page appears, "This proposal becomes a contract when accepted by Mr. Ronald Daspit and approved by Lionel J. Favret Construction Company, Inc."
Favret and the court viewed the signed proposal alone as the building contract. The court said during trial that all plans and drawings were made after the proposal was executed and were not part of the binding agreement. Larry Case, the court-appointed expert referred in his report of March 25, 1980 to the proposal and to the "shop drawings," D-1.
Daspit's position is that all three sets of drawings and the specifications, along with the proposal, make up the building contract and must be interpreted as a whole. It further asserts that any inconsistencies or ambiguities must be construed against Favret, preparer of the document. As authority for incorporation of other documents by reference the plaintiff cites Action Finance Corp. v. Nichols, 180 So.2d 81 (La.App. 2d Cir.1965), Harper v. Home Indemnity Company, 140 So.2d 653 (La.App. 2d Cir.1962), and Walker v. Gravier, 131 So.2d 553 (La. *1227 App. 3rd Cir.1961). In those three cases the other documents deemed incorporated were referred to with specificity in the written agreement and were in existence at the time the agreement was written.
In the case of Calcon, Incorporated v. Young Companies, Inc., 322 So.2d 883 (La. App. 1st Cir.1975) the court found that specifications referred to in a written contract did not become a part of the contract. The specifications had not been provided to the plaintiff subcontractor nor signed by the parties prior to the litigation.
In the case before us Ronald Daspit reported receiving a set of plans prior to signing the agreement that were essentially the same as the Scandaliato drawings and another set later which he ignored. He could not identify which set the Favret construction foreman used. Lionel Favret, Jr. testified that the Scandaliato drawings were made only to obtain the building permit and he did not give Mr. Daspit a set of construction drawings as part of the contract.
As noted earlier the contract and Scandaliato drawings are not in agreement, and Daspit's attorney reports that the three sets of drawings do not agree with each other. With two of the sets unavailable, i.e. the construction drawings (D-1) and the Star erection drawings (S-6), we are unable to make a factual determination of variances among the plans.
The evidence as outlined above does not show that there was a definite agreement between the parties as to the adoption of any particular set of drawings or specifications to alter the written contract. Accordingly, we are compelled to adopt, as did the trial judge, the written contract as the basic agreement controlling the obligations of each party, even though that agreement itself refers to other documents. This, of course, leads to ambiguities and incomplete specifications in some instances, but it is the only proven agreement upon which we can base a judgment.
Daspit asks the court to resolve the ambiguities in its favor and against the preparer of the contract. In Maxwell v. Bernard, 343 So.2d 431 (La.App. 3rd Cir.1977), cited by the plaintiff, the court quoted Louisiana Civil Code article 1958, which provides:
"But if the doubt or obscurity arise for the want of necessary explanation which one of the parties ought to have given, or from any other negligence or fault of his, the construction most favorable to the other party shall be adopted, whether he be obligor or obligee."
The court goes on to say, at 434:
"Our Courts have long held that any obscure provision present in a written contract must be construed against the party preparing the agreement. See Hebert v. Briley, 295 So.2d 607 (La.App. 3rd Cir.1974), writ refused, 300 So.2d 181 (La. 1974); Succession of Cormier, 80 So.2d 571 (La.App. 1st Cir.1955), and Ernest A. Carrere's Sons v. Rumore, 52 So.2d 57 (La.App.Orl.1951)...."

Roll-up or Overhead Doors
Daspit asks us to resolve the issue of type of doors required at the rear of the building2 overhead doors as opposed to 2 roll-up doorsbased upon the ambiguities and differences in the various documents.
Sam Scandaliato testified that his drawings, which show the preferred rollup doors were based on information provided by Favret. "... [T]he contractor tells us where the opening is and the type of doors that he wants." He was not given a copy of the proposal. His drawings did not, to the best of his knowledge, deviate from the contractor's verbal instructions. Lionel Favret, Jr. testified that he had no contact with Ronald Daspit in planning the building but that some "verbal" changes were made on the job by the superintendent, Richard Owens, and Mr. Daspit. Mr. Favret also testified that Favret's sales representative, Louis Negrotto, had negotiated with Mr. Daspit. Neither Owens nor Negrotto was called to testify.
As opposed to this, the contract specifically describes 2 sectional overhead doors and that is what was ordered by Favret from Star. Although overhead doors are less *1228 useful to Daspit than rollup doors which would cause less interference with a proposed crane operation, we cannot conclude that the contract was changed in this respect and find no ambiguity.

DEFECTS AND INCOMPLETE ITEMS
In its Reasons for Judgment the court stated that it adopted Case's findings of fact but based its valuation on the estimates of Dahlman and Fulco and evidence adduced at trial. We now discuss item by item the defects that remain in dispute.
Priming of Steel. The parties agree that Star is responsible for repriming the steel, although this is the only defect for which Star is responsible. The court granted an indemnification award of $5,425, as per a bid by Richard Straub, which Daspit feels is too low. The Case report recommended wire brushing and cleaning rather than sand blasting or shot blasting prior to painting. Dahlman testified that the process was time consuming and the number of man-hours difficult to guess. He estimated a cost of $9,034. As a firm bid for correcting the defect was submitted by the defendant, we affirm the judgment awarding indemnification of $5,425.
Slab Foundation. As to the sufficiency of the slab, the court found that it was adequate to sustain the loads to be placed on it, and made no award. Daspit asked for $14,983 to correct the slab. Joseph Fulco, Larry Case, and John L. Pfeffer, the plaintiff's engineer, all found cracks in the slab. Both Case and Pfeffer recommended building additional concrete foundations for the machines. Sam Scandaliato, designer of the foundation, reported that he had taken into consideration Daspit's requirements, had had soil borings made before designing it, and in March, 1980 found the slab to be functioning as anticipated. He explained the cracks as the normal result in a large slab of temperature, expansion, and contraction. He believed that if the weight of the machines was distributed by placing them upon mats, as Daspit told him he planned to do, the slab was adequate to bear the weight of a machine weighing as much as 46,000 pounds. As we find that the slab foundation is adequate for its intended purpose if the machines are placed on mats as planned, we affirm that portion of the judgment denying plaintiff's claim.
As to the surface defects, Case found the slab uneven and low in spots over the entire building, causing water to come into one area and recommended leveling and smoothing. Favret accepts responsibility but opposes the amount of the award, $1,621, which included replacement of the existing bar plate. We affirm the award of $1,621.
Roof. The court awarded a total of $2,943 for items related to roof repair. All the experts found that the roof leaked. Case found holes in the roof panels where screws were missing, deteriorated insulation, and leaking around the plumbing stack and the skylights. He recommended repairing the roof. Dahlman felt the nail holes were not the only reason and suspected the end laps were too short and improperly caulked. It would be impossible to find and patch the leaks because the spots were hidden by insulation, and he recommended replacing the roof. Pfeffer concurred in this opinion and also suspected an inlap problem. He thought the roof had not been secured to the frame properly and found the insulation to be useless because the vinyl back was torn off in places, the insulation material was saturated and sagging, and it was all mildewed.
Fulco suggested trying to repair first but said that he had no way of knowing the condition of the underside of the roof. If the problem was improper lapping of panels, then the roof would have to come off. He felt that repairing was not guaranteed to stop the leaks. Dahlman estimated a cost of $30,524 to remove and replace the entire roof, while Favret estimated $500 as the cost of repairing the roof.
We find the award of $2,943 for repairing the roof to be inadequate. There is no doubt that problems with the roof have continued despite some corrections having been made by the plaintiff. The testimony indicates that the extent of damage from *1229 rust and the source of the leaks can only be ascertained by removing sections of the roof. We cannot say with preciseness that the roof should not be replaced, but conclude that we must allow for more costly repairs than can be foreseen through surface inspection. Further, the roof's longevity, based on its present damaged condition, is more probably than not far less than the owner should reasonably expect.
In increasing the award, we are also taking into consideration the problem of the placement of skylights causing inadequate natural lighting. That item was not included in Case's report or in the judgment. Case testified that the locations on the Scandaliato drawings differ from those shown on the Star drawings. Ronald Daspit said that he gave Negrotto a hand drawing showing the placement he desired. We note that the contract called for twenty-four skylights. The contract does not show any placement and to this extent it is subject to the ambiguity rule advanced by Daspit. However, here again we can rely on the contract specifications to show that the placement must be incorrect. Lionel Favret, Jr. acknowledged that the purchase order showed that only twenty skylights were ordered. The Scandaliato drawing called for only eighteen. Only 18 were installed. As the trial judge found that the proposal alone constituted the building contract, we hold that he cannot disregard the requirement of 24 skylights and the plaintiff's complaint of inadequate light. Daspit is entitled to the number of skylights specified in the proposal and it follows that the placement of 24 panels must differ from placement of 18.
Accordingly we amend that portion of the judgment awarding $2,943 for corrections to the roof and increase the amount to $12,943 for repairing the roof and providing additional skylights.
Sliding Door. The court awarded a total of $784 to correct faulty installation of the sliding door and replacement of the sliding door jamb post.
The contract provided for one 20 feet by 14 feet 8 inches "single STAR steel sliding door." The Scandaliato drawings indicated a 10 feet by 16 feet door. We note that the Star purchase order specified "One 12 × 14.8 S.S. Door."
The Case report stated that the bottom track of the door was missing, the jamb post was damaged and that the sidewall girts were unattached to the door jamb post on one side. He recommended installing a proper door track and guide, replacement of the post, and reinstallation of the wall girt section to the door post in accordance with the "erection drawings."
Pfeffer found the sliding door to be inadequate for wind and jerry-rigged. Dahlman testified that the sliding door was "flimsily built," not a single door, did not close properly and needed to be rebuilt completely. Ronald Daspit pointed out that the door was made of two doors bolted together, could be pushed in easily and could not withstand hurricane winds. Lionel Favret, Jr. said the problem could be rectified by a guide angle on the bottom, a wood track on the top and completing the door fastening. Daspit asks for $3,640, Dahlman's March 5, 1980 estimate for rebuilding the door. We amend and award $3,640 for rebuilding the door to conform with the provisions of the contract.
Entrance and Sidelights
The court awarded $350 for installation of a secondary support for the canopy at the entrance and $1,000 to install 18 inch sidelights at the door. The court noted that the contract excluded glass and glazing but did include the sidelights and one glass door.
The Case report noted that the canopy was supported only by the sheet metal wall panels and that the drawings specified an additional post. Nine-inch sidelights had been installed instead of eighteen-inch sidelights.
We affirm the award of $1,350 for correction of the entrance and sidelights.
Miscellaneous items for which Favret accepts responsibility
The court awarded a total of $4,984 for correction of eight relatively minor items. *1230 Favret accepts responsibility but complains the awards are too high and insists that these items and the major ones discussed above all can be completed or corrected for $6,020, exclusive of roof repairs.
As the testimony bears out the trial judge's finding that the Favret in globo estimate falls far short of the total amount required for corrections, we affirm his award of $4,984 for the eight lesser items.

Items for which Favret denies responsibility
The court awarded $3,334 for replacing damaged and improperly hung paneling in the office areas, $1,910 for roughins of two water coolers, and $500 for checking all drain lines. As the evidence opposing the awards does not show the court's finding Favret responsible to be clearly wrong, we affirm the judgment as rendered.

SUBSTANTIAL COMPLETION
Even though work on a building is shown to be incomplete or defective, the contractor may yet recover the contract price less the cost of correction or completion when he has substantially performed the contract. If he has not, he is limited to quantum meruit.
The law pertaining to substantial performance is well summarized by the court in Ruby Brown Builders v. St. Bernard Linen, 428 So.2d 534 (La.App. 4th Cir. 1983) at 535:
"When a contractor has `substantially performed' a building contract, he is entitled to recover the contract price, even though defects or omissions are present. Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961); Neel v. O'Quinn, 313 So.2d 286 (La.App. 3rd Cir. 1975), writ denied 319 So.2d 440 (La. 1975). `Substantial performance' means that, despite the deficiencies, the construction is fit for the purpose intended. Pete's Plumbing & Heating, Inc. v. Geissert, 413 So.2d 554 (La.App. 4th Cir.1982); Neel v. O'Quinn, supra. Factors bearing on this factual determination include: the extent of the defect or non-performance, the degree to which the purpose of the contract is defeated, the ease of correction, and the use or benefit to the owner of the work performed. Airco Refrigeration Service, Inc. v. Fink, Supra; Pete's Plumbing & Heating, Inc. v. Geissert, supra; Design & Corrosion Eng. v. Piggly Wiggly, 408 So.2d 292 (La.App. 2d Cir.1981)."
In the case at hand we are dealing primarily with defective, rather than incomplete workmanship, as the items which were unfinished are minor ones.
The court in Martin v. AAA Brick Co., Inc., 386 So.2d 987 (La.App. 3rd Cir.1980) dealt with the issue of substantial completion where a fireplace was so poorly built that it had to be demolished. It held that the contractor could not recover on the contract because the homeowners had received no benefit. In Scott Fence & Insulation Company v. Boudro, 252 So.2d 458 (La.App. 4th Cir.1971), there was not substantial completion where the contractor had put up a fence but had not adhered to the location and type of materials required by the contract.
Daspit's position is that the building was unfit for its purpose because of leaking roof and other deficiencies and the contractor should not recover under the contract.
Favret insists the building was substantially complete, that the miscellaneous items complained of were "punch list" items that Daspit would not allow him to complete, the roof was repairable, and that there were no deviations from the agreement.
Although the plaintiff's experts testified that they felt the building was not complete or usable for its purpose with the leaking roof, the plaintiff has in fact begun to use the building. Mr. Daspit testified that he had had some corrective work performed on the roof and at time of trial had been using the building for several months as a storage area. He had occupied the office and shop for a few weeks, but had retained the large pieces of machinery at the old plant.
Accordingly, we affirm the trial court's finding of substantial completion.

*1231 SPECIAL DAMAGES
Daspit
The plaintiff complains that the court was in error in failing to admit testimony on loss of business due to Favret's delay in starting and completing construction of the building. The court refused to admit the testimony on the ground that damages due to loss of business were not listed as a contested issue of fact in the pretrial order, nor were witnesses and documents relative to the issue. The court allowed Daspit to introduce letters from potential international customers on proffer.
The purpose of pre-trial proceedings, as provided by La.C.C.P. article 1551, is to limit the trial to contested issues. The court is allowed to:
"... render an order (which, of course, may be prepared by the parties) that, among other things, `limits the issues for trial.' The article further provides that the order, unless modified to prevent manifest injustice, controls the subsequent course of the action." Navarro v. Bommarito, 367 So.2d 74 (La.App. 4th Cir.1979), at 76.
Daspit asserts that the issue appears twice as a contested issue of fact in the order: in the Star suit a "potential liability of Favret as a result of the Daspit complaint and litigation," and in the Daspit suit, as "amount of damages both special and general."
After reviewing the proffered documents, we believe that live witnesses and additional documents would have been required to prove Daspit's claim of lost business. As Daspit failed to list them in the pre-trial order, we find that the trial judge was correct in refusing to admit testimony.
Favret
Favret assigns as error the court's failure to award it an additional $7,536 for delay damages and additional erection costs. It blames the two month delay upon Daspit's failure to prepare the site for construction and obtain the building permit. The additional costs of erection are alleged to be due to Daspit's failure to provide access. No delay penalty against either party was provided in the contract. The testimony of Mr. Favret and of Mr. Daspit indicated that Favret had failed to check with its customer regarding the permit and that its salesman, Lewis Negrotto, had told Mr. Daspit he would obtain it. Daspit had agreed after the contract was signed to have Favret prepare the site at Daspit's cost. Mr. Favret testified without any documentary evidence, although he testified as to his method of calculating the additional overhead costs.
We find that the trial court was correct in disallowing the additional claim of Favret for delay damages and increased erection costs.
Accordingly, we amend the judgment of the trial court by increasing the award to the plaintiff Daspit Bros. Marine Divers, Inc. to the sum of $37,158, and as amended, we affirm the judgment appealed. Costs of this appeal are cast against Lionel J. Favret Construction Co.
AMENDED AND AFFIRMED.