534 So.2d 1364 (1988)
E.B. LUDWIG STEEL CORPORATION
v.
C.J. WADDELL CONTRACTORS, INC. and Fidelity & Deposit Company of Maryland.
The NEW ORLEANS CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS
v.
C.J. WADDELL CONTRACTORS, INC., and Fidelity and Deposit Company of Maryland, et al.
C.J. WADDELL CONTRACTORS, INC.
v.
The ROMAN CATHOLIC CHURCH, ARCHDIOCESE OF NEW ORLEANS, et al.
ALL AMERICAN DECORATING SERVICE, INC.
v.
C.J. WADDELL CONTRACTORS, INC., and Fidelity and Deposit Company of Maryland.
Nos. 88-CA-379 to 88-CA-382.
Court of Appeal of Louisiana, Fifth Circuit.
November 16, 1988.
Writ Denied January 20, 1989.
*1365 Elsie B. Halford, Metairie, for defendant/appellee.
Denechaud and Denechaud, New Orleans, for plaintiff/appellant.
Before BOWES, GRISBAUM, and GOTHARD, JJ.
GOTHARD, Judge.
This consolidated suit arises from a controversy between the owners, the general contractor, and the various subcontractors on a private building project.
The Archdiocese of New Orleans entered into a contract with C.J. Waddell Contractors, Inc., of which C.J. Waddell was owner and principal shareholder, to build additions to and renovate existing buildings at the Our Lady of Divine Providence parish school (hereafter "School") in Kenner. The contract was signed on June 18, 1984 and the job was to be completed by December 8, 1984, later extended to December 14. Completion was delayed and on February 4, 1985 Waddell was terminated as contractor, with notice to the bonding company, Fidelity & Deposit Company of Maryland.
The contract price, including change orders, was $253,008.39. Under the contract the Archdiocese was to make periodic payments for the work completed at the end of each month minus a retainage of 10%, pending final acceptance. At the time Waddell was terminated the Archdiocese had paid him $172,763.68, leaving a balance of $80,244.71 due on the contract. The Archdiocese retained the balance, alleging that it was entitled to the retainage to cover the cost of completion by another contractor and liquidated damages for the delay at the rate of $200 per day as provided in the contract.
After accepting the project, on June 21, 1985 the Archdiocese filed a petition for a concursus and deposited $6,122.88 into the registry of the court for the benefit of the contractor, surety, and subcontractors, etc. The Archdiocese sought by this means to have all liens and privileges on the property cancelled and to be released from liability for any further claims arising from the building contract. The Archdiocese also demanded costs and attorneys' fees. Prior to the concursus petition, E.B. Ludwig Steel Corporation, supplier of the steel components of the buildings, and All American Decorating Service, Inc., the painting contractor, had filed suits against C.J. Waddell Contractors, Inc., and Fidelity & Deposit Corporation of Maryland, seeking payment. Following the Archdiocese's *1366 suit, Waddell sued the Archdiocese for the balance of the contract price.
The suits were ordered consolidated for trial and were heard by a judge in two segments on February 11 through 13, 1987 and June 16 through 19, 1987. An amended judgment was signed on November 18, 1987 in which the court rendered judgment in favor of various subcontractors and suppliers against C.J. Waddell Contractors, Inc. and Fidelity & Deposit Company of Maryland for the stipulated amounts of their claims. An additional award was made to all American Decorating against the Archdiocese in the amount of $5,096.00.
Judgment was rendered also in favor of C.J. Waddell Contractors, Inc. and against the Archdiocese in the amount of $219,644.71 plus legal interest from date of judicial demand. All costs were to be borne by the Archdiocese. In his reasons for judgment the trial judge stated that he found the project was substantially complete when Waddell was terminated. He found that the delays were not caused by Waddell but by the failure of the Archdiocese to appoint another architect to replace the project architect who became gravely ill. He explained that he calculated the award to Waddell as follows: From the balance due on the contract, $80,244.71, he deducted $5,000 which was needed to complete the work and $5,600 to repair and replace a roof, leaving a balance of $69,644.71. He then added $150,000 in damages to Waddell for loss of his construction business because of the breach of contract by the Archdiocese and arrived at a total of $219,644.71. The Archdiocese appealed suspensively and Waddell answered the appeal.
Issues raised by the Archdiocese are as follows: 1) whether a contractor is entitled to an award of "exemplary damages" for loss of future business under Louisiana law; 2) whether the Archdiocese was legally entitled to terminate Waddell's employment and retain an amount from the balance due on the contract sufficient to pay another contractor to complete the job; 3) whether the Archdiocese was entitled to recover liquidated damages; and 4) whether the actions or inactions of the architect or owner were in fact the cause of the delay or whether the delay was caused by factors within the control of the contractor.
In answering the appeal Waddell seeks an increase in the award of the balance due on the contract to $77,744 and an award of attorney's fees of $25,000 for bad faith breach of contract.
RESPONSIBILITY FOR THE DELAY IN COMPLETION.
We consider first the issue of whether the owner or the contractor caused the delay, as that determination of fact has a bearing on all other issues. James D. Carter was the project architect who prepared the plans and specifications and who was responsible for supervision of the job. Work began on July 12, 1984. At some point between that date and mid-September Mr. Carter was found to be gravely ill and on September 17 he asked the School building committee to cancel his contract and replace him. The Archdiocese chose not to honor his request and instead appointed Roy Burst to represent the architect in the field as of September 26, 1988. Burst was not an architect but was a long time employee of the Port of New Orleans who had for many years inspected Port facilities for damage. He testified that he was hired part time to visit the site as needed, to assist Mr. Carter in reviewing shop drawings, writing letters, and making copies and deliveries. He generally visited the job at noon or after work and reported to Mr. Carter at his home. Waddell and his superintendant, Mike King, were instructed not to deal directly with Mr. Carter, only with Burst.
Mr. Carter's deposition was taken on June 21, 1985 and was admitted into evidence in lieu of testimony as he died before trial. In it he stated that he was completely incapacitated during the months of November, December, and January but still made all decisions himself, based on information provided by Burst. He had Burst sign his letters as a convenience so Burst *1367 would not have to make a return trip after they were typed. Burst admitted at trial that during the fall Carter was virtually blind and he not only signed Carter's name but described to him items on E.B. Ludwig's shop drawings submitted for Carter's approval as early as October. We assume that Burst actually reviewed the drawings. He had difficulty in interpreting some items and asked for details to be drawn, apparently unaware that the components were detailed in the steel supplier's standard detail book, which had been delivered to Mr. Carter in September. The deposition of Mr. Carter and testimony of Burst support the conclusion of the judge that Burst was in fact performing architectural duties on the project, for which he was not qualified.
The delayed approval of the shop drawings was the most serious problem attributable to the owner. Other major delays were encountered earlier in the architect's approval of paint colors, and later in the redesign of a foundation for a covered walkway. In excavating for the walkway the contractor had discovered an electrical conduit. The delay in receiving the revised design placed erection of the walkway several weeks behind and also delayed the electrician in making his final tie-in from the addition to the existing building.
The substitution of Roy Burst was contrary to the provisions of the standard American Institute of Architects contract that governed the project and was determined by the court to be a breach. The General Conditions section regarding the architect reads, in pertinent part:
2.1 DEFINITION
2.1.1 The Architect is the person lawfully licensed to practice architecture, or an entity lawfully practicing architecture identified as such in the Owner-Contractor Agreement, and is referred to throughout the Contract Documents as if singular in number and masculine in gender. The term Architect means the Architect or his authorized representative.
2.2 ADMINISTRATION OF THE CONTRACT
2.2.1 The Architect will provide administration of the Contract as hereinafter described.
. . . . .
2.2.17 If the Owner and Architect agree, the Architect will provide one or more Project Representatives to assist the Architect in carrying out his responsibilities at the site. The duties, responsibilities and limitations of authority of any such Project Representative shall be as set forth in an exhibit to be incorporated in the Contract Documents.
2.2.18 The duties, responsibilities and limitations of authority of the Architect as the Owner's representative during construction as set forth in the Contract Documents will not be modified or extended without written consent of the Owner, the Contractor and the Architect.
2.2.19 In case of the termination of the employment of the Architect, the Owner shall appoint an architect against whom the Contractor makes no reasonable objection whose status under the Contract Documents shall be that of the former architect. Any dispute in connection with such appointment shall be subject to arbitration.
. . . . .
There was no consent from Waddell as contractor and no written document setting forth Burst's duties or the modification of Carter's duties. Both Waddell and King testified that they were not aware of the extent of Carter's disability and that Burst was reviewing the drawings. We find that the record supports the trial judge's conclusion that, "... the archdiocese's violation of the contract concerning the replacement of the architect is the principal cause of the delay and confusion in this job...."
Liquidated Damages. The Archdiocese argues that it was entitled to the liquidated damages specified by the contract. It calculated the amount due to be $23,000, at $200 per day from the completion *1368 date, December 14, 1984,[1] until it accepted the project from Melancon on April 9, 1985. While LSA-C.C. art. 2005 provides that the parties may stipulate damages to be recovered in case of delay, article 2008 provides that:
An obligor whose failure to perform the principal obligation is justified by a valid excuse is also relieved of liability for stipulated damages.
See G. Salvaggio & Co., Inc. v. Delta Heights, Inc., 277 So.2d 754 (La.App. 4th Cir. 1973). As we have determined that the delay in completion of the project was not attributable to the contractor, we find that the Archdiocese was not entitled to recover stipulated damages.
OWNER'S RIGHT TO TERMINATE WADDELL.
The Archdiocese maintains that it had the right to fire the contractor with or without cause, under the provisions of LSA-C.C. art. 2765, as follows:
The proprietor has a right to cancel at pleasure the bargain he has made, even in case the work has already been commenced, by paying the undertaker for the expense and labor already incurred, and such damages as the nature of the case may require.
Waddell responds that article 2014 is applicable, as the project was substantially complete when he was ejected from the job. Article 2014 provides:
A contract may not be dissolved when the obligor has rendered a substantial part of the performance and the part not rendered does not substantially impair the interest of the obligee.
A discussion of the matter of substantial completion appears in Huguet v. Musso Partnership, 509 So.2d 91 (La.App. 1st Cir. 1987), writ denied 512 So.2d 462 (La.1987), in which the court stated that criteria for substantial performance include the extent of the defect or non performance, the degree to which the deficiency defeats the purpose of the contract, the ease of correction, and the use or benefit to the owner of the work performed. Substantial completion is a question of fact, to which the manifest error rule applies. See also Gibbens Pools, Inc. v. Corrington, 446 So.2d 420 (La.App. 4th Cir.1984), writ denied 447 So.2d 1070 (La.1984).
Waddell submitted requests for payment for work completed through November 30, which the Archdiocese honored. According to Waddell's testimony, Burst informed him at that time that no further payments would be made until the project had been completed, hence he filed no further requests. The suppliers and subcontractors understandably began pressing Waddell for payment and eventually filed liens.
On January 4, 1985 by letter signed by Burst for Carter, Waddell was informed that liquidated damages had begun to accrue, that the architect was considering advising the owner to declare him in default, and that a copy of the letter was being sent to the surety. The letter contained a list of 46 items which allegedly had not been completed or needed correction; the list was compiled by Burst. A second letter was mailed on January 21, giving formal notice that if the items of a second list were not completed by February 4, 1985, the contract would be terminated. That list contained 178 items. On February 4, Burst and Kenneth Brassette, head of the church building committee, met with Waddell at the site, decided the work was incomplete, and handed him a letter terminating the contract and ejecting him from the job.
Substantial Performance. A review of the testimony of Don Pfefferle, an architect attached to the Archdiocese, and of Waddell and King reveals considerable disagreement *1369 as to whether the job was substantially performed at the time Waddell was fired. Waddell stated that the items that were his responsibility would take only two or three days to complete and that the job was 99% finished. His superintendent, King estimated three days and felt it was 97% complete, while Pfefferle believed the job to be 60% complete. Pfefferle testified that he thought it would take two weeks to finish as there was much corrective work, rather than completion work, to be done. It is unclear whether Pfefferle actually inspected the project on or about February 6 or whether he simply reviewed the January 21 list, as the testimony is conflicting on this point.
The electrical contractor testified that he needed only two more days to correct any problems on the list. The plumbing contractor testified that he had taken care of all items that were his responsibility before February 2, his last work day. The painting contractor testified that he had only a few days' work left and that Burst had delayed them by stopping their work "because of temperature conditions." He disputed several items that he stated were not included in the contract or were not his responsibility because they involved repainting the patching or damage done by other contractors. Finally, after first testifying that the work took more than two months, the successor general contractor, Paul Melancon, admitted that the work he did for the school took only twenty-two working days, including three contracts that were separate from completion of the Waddell job. The additional work included building cabinets and shelves, installing a suspended ceiling in concourse 7 required by the fire marshal, and building a fire wall that had been deleted from the original plan as an economy measure but was required by the fire marshal as a condition of opening the school. In his deposition Ken Brassette, an experienced construction superintendent, estimated that about two weeks would have been needed to construct the fire wall alone.
We conclude that, although some work remained and there were some minor defects that needed correction, the trial judge was not clearly wrong in determining that at the time Waddell was terminated the project had been substantially performed. The building could have been used within a very short time if Waddell had been allowed to finish, except for the unconstructed fire wall, a problem attributable to the owner.
Cost of Completion/Correction. We next consider the Archdiocese's claim for $50,921.93, allegedly the cost to complete and correct the project. When a contractor has substantially completed a building project he may recover the contract price less the cost of correction and/or completion. Daspit Bros. v. Lionel J. Favret Const., 436 So.2d 1223 (La.App. 5th Cir. 1983). In this case the court allowed the Archdiocese retainage of $5,000 to complete the contract and $5,600 to replace a poorly installed roof.
The Archdiocese submitted as proof of its costs its itemized answer to Waddell's interrogatories on a stipulation that Melancon's testimony would repeat that information. Waddell contends first that the Archdiocese failed to produce proof of Melancon's labor charges. The charges were based on Melancon's daily work sheet; however, in testifying Melancon was uncertain what portion of a charge for "general labor" was attributable to the Waddell job rather than to the separate contracts.
Waddell also argues that most of the work was redone unnecessarily, in that it had been approved previously or had been completed. For example, because Melancon's employees were inexperienced as painters they were unable to match the paint and texture for touch up and redid entire walls. Robert Schenk, the painting contractor, testified that the products used by Melancon were completely different from those used by his company and could not possibly have matched the original job. The texturing material Melancon used was "regular joint compound mixed down to texture." Schenk testified that the original material his own men had used was a polystyrene *1370 aggregate that could not have been patched successfully with watered down joint compound; the specified material produced a highly textured surface while Melancon's mixture was relatively flat. Schenk explained further that the specifications called for and he used a flat latex paint, while Melancon ordered latex semi-gloss, a paint with a different sheen.
Another area of dispute was the successor's plumbing charges, incurred when Melancon, on orders from Burst, moved and reconnected a grease trap which had already been approved by the Jefferson Parish inspector. The architect's mechanical engineer had previously approved the relocation of the trap from the specified position.
Two unnecessary electrical items performed by Melancon were changing an amp disconnect, previously approved by the project electric engineer, and having the whole electric system checked when it had already been tested and approved by an independent testing firm. In addition, Jefferson Parish inspectors had certified the work.
The trial court found and we agree that replacement of the roof was necessary, as problems remained after Melancon attempted to make repairs. Waddell admitted that the metal components had been drilled inaccurately, so that they were misaligned, but he felt that replacement was not required and he noted that it was not mentioned in the January 24 list. He testified that holes could be re-drilled in the purlins (supports to which the metal sheets are attached) so as to realign the sheets. The unused holes also could be filled with fiberglass, according to Waddell and Nofie Alfonso, an architect who checked the construction in March, 1985; however, Alfonso indicated that might be as costly as replacing the roof. Alfonso's inspection indicated poor workmanship in general, holes that should not have been there, improper sealing, and unswept filings that had caused rust. We agree with Don Pfefferle, who was of the opinion that a new roof which required extensive patching so soon after its installation was unacceptable.
As to the cost of $5,000 allowed by the judge to complete the project, we find insufficient proof to support Waddell's demand on appeal for a reduction to $2,500. Only Waddell and King provided that figure, with insufficient documentation. Waddell made notations beside certain items on the January 21 list that he testified were estimated amounts to finish, totaling $1120. In addition, the electrician estimated his expense at $500 and the painting contractor at $1,260. Accordingly, the court's allowance of $5,000 appears to be more realistic.
In summary, having considered the claims of both the appellant and appellee, we find no error in the trial court's award of a net amount of $69,644.71 to C.J. Waddell Contractors.
AWARD OF DAMAGES TO CONTRACTOR
Waddell's company's petition in its suit against the Archdiocese sought enforcement of its lien, "statutory penalties, interest and attorney fees," and "loss of profits from inability to secure performance bond because of the Church's action and default" in the amount of $100,000.
The trial court awarded $150,000 in damages and explained, in the reasons for judgment:
It is well settled the damages for breach of contract are based on placing the non-breaching party in as good a condition as that party would have occupied had the breach not taken place.
While there has been no showing of bad faith on the part of the archdiocese, the fact remains that Waddell had a going business which was destroyed by a breach herein. Waddell has been put in default, causing a serious loss of reputation and the evidence shows that Waddell is no longer bondable. Thus, to all intents and purposes Waddell has been forced out of the construction contracting business.

*1371 The court is of the opinion that the damages sustained by Waddell at (sic) a minimum of $150,000.00.
The Archdiocese contends that the award of damages, which it calls "exemplary damages," was based upon a manifestly erroneous finding of fact and an erroneous conclusion of law. The appellant's position is that under contract law Waddell was entitled to recover no more than the balance due under the contract minus the amount needed to complete the job. Damages, if any, were limited to those within the contemplation of the parties at the time the contract was confected.
Waddell argues that he is entitled to the damage award under either contract or tort law. His position is that the Archdiocese was in bad faith in breaching the contract and in its actions following his termination; further, the damage award was proper compensation for the monetary losses he sustained, even if the Archdiocese were adjudged to be in good faith. Under tort theory the Archdiocese was liable for damage to Waddell's business reputation, that is, defamation.
Under LSA-C.C. art. 1995, "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." Spence v. Webster Parish School Bd., 499 So.2d 217 (La.App. 2nd Cir.1986). Article 1996 does indeed provide that if the obligor was in good faith, he is liable only for damages that were foreseeable at the time the contract was made. But an obligor in bad faith "... is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." LSA-C.C. art. 1997.
Bad Faith. Waddell, in arguing that the Archdiocese was in bad faith, refers us to Williams Engineering, Inc. v. Goodyear, 480 So.2d 772 (La.App. 5th Cir. 1985), affirmed 496 So.2d 1012 (La.1986), but the facts in that case took place before the 1984 revision of the obligations articles. LSA-C.C. Article 1934(1) stated:
... By bad faith ... is not meant the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will.
New article 1997 applies to our case. Although the revision retains the substance of article 1934(2), comment (b) states that, "An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation." (Emphasis supplied.)
Although the Archdiocese's actions both before and after terminating Waddell may be characterized as expedient and self-serving, we are unable to say that they were motivated by malice. Accordingly, we agree with the trial court's finding that the Archdiocese did not act in bad faith.
Furthermore, the burden of proving the extent of his damages falls upon the one who seeks them. As explained in Dixie Life Ins. v. Pacific Mut. Life Ins., 416 So.2d 139 (La.App. 4th Cir. 1982), only actual, not speculative or conjectural damages may be recovered.
Even considering the much discretion allowed to the trial judge in awarding damages, we are unable to justify the award of $150,000 for loss of the construction business. Waddell's proof of his losses consisted of his and Mike King's testimony and the face sheets of the corporate tax returns for the years 1980 through 1985.
Waddell and King both stated that the company had had a steady flow of work in the past, including several jobs for the Archdiocese. Waddell testified that because the Archdiocese withheld payment after November, he had to use his available cash to pay subcontractors. Then after the termination he was no longer bondable, could not bid on jobs of over $100,000, had no credit, and was no longer able to get low bids from subcontractors. He closed his office because he was unable to pay the rent and laid off his employees.
The tax returns are difficult to use as a basis for calculating Waddell's actual losses without testimony from an accountant. For example, the 1984 return indicated assets *1372 of $475,404 but a net operating loss of $75,366. The appellant suggests that the return indicates that the business was failing prior to Waddell's problems on the school job. We are unable to determine from the records and testimony what profit Waddell anticipated from the job, had it progressed on schedule, or under the economic situation existing in 1985 how much he could realistically have expected to net in that year. There is no expert testimony as to the value of the business as a going concern. We acknowledge that Waddell's business reputation and ability to obtain future contracts was damaged but find that without better proof any award is speculative. Accordingly, we find that the damage award of $150,000 was an abuse of discretion.
Defamation. Insofar as Waddell's claim of defamation, this is based upon the Archdiocese's communications with the bonding company. Copies of letters to Waddell, dated January 4, January 21, and February 4, 1985, on James D. Carter's stationery to which Burst admitted having signed Carter's name, were mailed to the company. A letter, ostensibly from Carter to the bonding company, dated February 6, 1985, notified the company of plans to have Paul Melancon correct and complete the project. Copies of all the letters were sent to eight other persons who were directly connected with the project.
A succinct summary of the elements of a defamation action and the defense of a qualified or conditional privilege appears in O'Dell v. Deich, 496 So.2d 1074, 1076 (La. App. 4th Cir.1986), as follows:
The essential elements of a defamation action are: (1) defamatory words; (2) publication or communication to some person other than the one defamed; (3) falsity; (4) malice, actual or implied; and (5) resulting injury. Cangelosi v. Schwegmann Brothers Giant Supermarkets, 390 So.2d 196 (La.1980). However, a person may enjoy a qualified or conditional privilege in making a statement, if it is made (1) in good faith, (2) on a subject in which the person communicating has an interest or owes a duty, and (3) to a person having a corresponding interest or duty. Alford v. Georgia-Pacific Corp., 331 So.2d 558 (La.App. 1st Cir.), writ denied, 334 So.2d 427 (La. 1976).
At the time the letters were written, the writer (Burst, assisted by Carter and Brassette) believed in the truth of what he said. Only at trial was it determined that the project was substantially complete when Waddell was terminated, that the Archdiocese was primarily responsible for the delays, and that many of the deficiencies listed in the letters were either miniscule or previously approved. There has been no showing that the Archdiocese wished to ruin Waddell, but that those concerned with the project were dissatisfied with Waddell's performance and the delayed completion. The communication was made on a subject in which the communicator had an interest or duty and only to persons having a corresponding interest or duty. For these reasons we find that the allegedly defamatory statements were made under a qualified or conditional privilege and that Waddell was not entitled to damages for defamation.
Attorney's Fees. We find no legal basis for award of attorney's fees sought by the appellee. The contract between Waddell and the Archdiocese did not provide for attorney's fees to the contractor in the event of litigation, and the Archdiocese was not found to be in bad faith; further, we find no statutory provision for attorney's fees under the circumstances of this case. Accordingly, the trial court correctly denied the appellee's claim.
Having determined that C.J. Waddell was not entitled to $150,000 in damages, we revise the judgment and reduce the award to Waddell from $219,644.71 to $69,644.71. In all other respects the judgment of the trial court is affirmed.
REVISED IN PART, AND AS REVISED AFFIRMED.
NOTES
[1] December 14, 1984 is the date of completion (extended from December 8) as stated in letters to Waddell from James D. Carter dated January 4, 1985 and January 21, 1985. Counsel for the Archdiocese incorrectly states on page 17 of his brief that, "Waddell was given an extension of twenty-one days beyond the completion date...." A twenty-one day extension, until December 29, was granted for the covered walkway only.