408 So.2d 292 (1981)
DESIGN & CORROSION ENGINEERING, INC., Plaintiff-Appellee,
v.
PIGGLY WIGGLY OF MANSFIELD, INC., Defendant-Appellant.
No. 14717.
Court of Appeal of Louisiana, Second Circuit.
December 7, 1981.
*293 Wiener, Weiss, Madison & Howell by John M. Madison, Jr., Shreveport, for defendant-appellant.
Rothell & Cohn, Ltd. (A Professional Law Corp.) by David A. Rothell, Mansfield, for plaintiff-appellee.
Before HALL, MARVIN and FRED W. JONES, Jr., JJ.
FRED W. JONES, Jr., Judge.
Plaintiff contractor sued a defendant property owner to recover the total amount allegedly due under a contract involving the asphalt overlay of a parking lot and incidental work. From a judgment in favor of plaintiff as prayed for, defendant appealed, contending that the trial judge erred in:
(1) Holding that plaintiff substantially performed its obligations under the contract, rather than limiting recovery to quantum meruit.
(2) Failing to reduce the amount of plaintiff's recovery by the sum proven necessary to perfect or complete the work.
(3) Finding, alternatively, that use of the parking lot by defendant constituted acceptance of the work, thus entitling plaintiff to recover the full contract price.
We affirm.
In June 1980 plaintiff and defendant entered into a written contract under which plaintiff was to fill in pot holes, sweep and overlay with asphalt cement defendant's grocery store parking lot in Mansfield for a contract price of $23,112. A subsequent agreement concerning additional work increased that total contract price to $24,512. Work under the contract commenced on June 10, 1980 and was purportedly completed a week later.
Defendant refused to pay any part of the contract price, contending that plaintiff's work was totally unsatisfactory. Consequently, plaintiff filed suit for $24,512. Defendant answered, denying owing plaintiff anything, and reconvened for $340.32 paid to engineers to conduct tests with reference to plaintiff's work. Trial was had on February 12, 1981.
In a written opinion the trial judge concluded that, although there were deficiencies in plaintiff's work, these were not of sufficient seriousness to prevent a finding of substantial performance of its contractual obligations; that defendant failed to prove either the extent of the claimed defects *294 or what it would cost to cure them; and that, even if the cost of remedying the defects had been proven, defendant was barred from recovering that cost because it had accepted the contract work.
As acknowledged by the parties, the written agreement involved in this litigation is a building contract as defined by Louisiana Civil Code Article 2756[1]. Consequently, Louisiana Civil Code Article 2769[2] contains the basic applicable law.
According to the consistent jurisprudential interpretation of Article 2769, substantial performance of a building contract entitles the contractor to recovery under the contract. Whether there has been substantial performance is a question of fact. Among factors to consider in determing substantial performance are the extent of the claimed defects or incomplete work, the degree to which the purpose of the contract is defeated, the ease of correction, and the use or benefit to the owner of the work performed. Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961); Lane Wilson Co., Inc. v. Gregory, 322 So.2d 369 (La.App. 2d Cir. 1975); Neel v. O'Quinn, 313 So.2d 286 (La.App. 3rd Cir. 1975); Florida Ice Machine Corp. v. Branton Insulation, Inc., 290 So.2d 415 (La.App. 4th Cir. 1974); Maloney v. Oak Builders, Inc., 224 So.2d 161 (La.App. 4th Cir. 1969).
Where there has been substantial performance of the contract, the remedy of an owner who complains of defective or incomplete work is to prove (a) the existence of the defects or omissions and (b) the cost of repairing the defective work or completing the unfinished work. If the owner discharges his burden of proof, recovery by the contractor of the total contract price will be reduced by the cost of correcting or completing the work. Airco Refrigeration Service, Inc. v. Fink, supra; Neel v. O'Quinn, supra; Florida Ice Machine Corp. v. Branton Insulation, Inc., supra.
Defendant argues that plaintiff's principal obligation under the contract was to overlay the parking lot with a 1½ inch layer of asphalt; that tests revealed the average thickness of the asphalt actually laid to be 1.36 inches; and that loose gravel, loose joints and rough spots on the parking lot evidenced defective workmanship. Because of this, defendant contends that plaintiff did not prove substantial performance of its contractual obligations.
J. R. Hunter, an employee of plaintiff who had been doing asphalt work for about 20 years, negotiated the contract on behalf of plaintiff, was in charge of the project and actually operated a machine which "rolled out" the asphalt on the surface encompassed by the contract. Hunter understood that under the contract he was to "patch all the holes ... sweep the lot with a sweeper, and clean it up and lay an inch and one-half asphalt." The area to be covered, including an access road, measured 5478 square yards. An industrywide "rule of thumb" calculated that, for a 1½ inch overlay, one ton of asphalt should cover an area of 12.12 square yards. Applying this formula to the area in question, something less than 500 tons would have been required. Hunter testified that, in fact, he applied 528.54 tons of asphalt on defendant's parking lot and access road.
Hunter further stated that, because certain areas of the parking lot were in good condition, he was requested by defendant's president, Thompkins, to take some of the asphalt intended for those areas and use it on a back access road which had been worn down by heavy delivery trucks. When this was done, asphalt placed on the access road was four or five inches thick in places.
According to Hunter, Thompkins was leaving town a day or so before the job was completed and offered at that time to pay *295 him the contract price. Hunter refused to accept the payment, suggesting that Thompkins wait until the job was completed.
Hunter testified that he inspected the parking lot on the morning of the trial and found it was "holding up real good, was real serviceable ..."
Mukesh Patel, a certified asphalt concrete technician employed by a Shreveport engineering laboratory, testified that at plaintiff's request he took from defendant's parking lot (including both old and new) a core sample of asphalt which tested 2¼ inches in thickness. Patel explained that the generally accepted method in the asphalt business for determining whether the required amount of asphalt has been applied is by use of a total tonnage criterion because:
"... when you overlay any kind of existing surface, and if they call for an inch and a half or two inch you are not going to have an inch and a half all the way down every place of the parking lot, because you have already got the existing surface, and you have to follow your contour and level it ... so when you overlay that's why it doesn't come out an inch and a half all the time ..."
Defendant's president, Thompkins, testified that during the course of the asphalt work he discussed with Hunter certain deficiencies in the work, such as areas that were not level and loose rocks. Hunter allegedly replied that these problems would be resolved once "traffic gets on it and the sun hits it ..." Thompkins admitted offering to pay Hunter on the last day of the project because he was leaving town on vacation, but Hunter told him "not worry about it because they were not through."
Thompkins stated that, upon returning from his vacation, he noticed big rocks coming up in the parking lot; areas around light poles that had not been compacted; and other areas that did not have a sufficient layer of asphalt. When he complained about these problems to plaintiff's president, the latter sent a crew to sweep the lot but this "just compounded the problem because when the rocks were swept off it just left holes." Thompkins then retained an engineering firm to test the thickness of the asphalt layer applied to his parking lot by plaintiff.
Thompkins conceded that the parking lot overlaid by plaintiff had been used by his customers seven days a week during the period between June, 1980 and February 12, 1981, the date of the trial. There was no evidence that defendant had any remedial work done to the parking lot. The record contains no photographs depicting the condition of the parking lot surface either after purported completion of the job or at the time of the trial.
Willis Brown, an officer of B.S.T. Testing, an engineering firm, stated that his firm was retained by defendant to obtain random core samples of asphalt from its grocery store parking lot to determine the thickness of the asphalt layer applied by plaintiff. According to Brown, the firm took eleven core samples which, upon testing, revealed an average thickness of 1.36 inches. The following pertinent colloquy took place between plaintiff's counsel and Brown:
"Q. And, of course, as it clearly reflects some were somewhat less than average and some were somewhat greater than average, is that right?
A. Yes, sir.
Q. Would you agree that if we went out today and took eleven different core samples in eleven different spots from the ones which you extracted the samples, it is very likely that we would come up with a different average than you got, is that correct?
A. Yes, sir.
Q. As a matter of fact you could run a great many tests and come up with different results every time, is that right?
A. Right."
William Bryant, who had been in the asphalt paving business a number of years, was called to testify by defendant. Bryant *296 stated that he examined the parking lot in question at the request of plaintiff's president. He found "a little bit of ravelling in two or three of the joints out front with some rocks showing." His general assessment of the job was that "it wasn't real bad and it wasn't real good, I mean, it still needed a little touch up done to it." Based upon a common industrywide use of 110 pounds of asphalt per square inch, Bryant calculated that roughly 456 tons of asphalt should have adequately covered the area involved here.
Bryant had told Thompkins that he would charge around $11,000 to bring the job up to his expectations. Bryant explained at the trial that "these figures were all verbal and off the top of our heads and so forth for a repair of the rough edge that we saw that day and a seal coat over the entire parking lot ..." It was conceded that seal coating was not in plaintiff's contract.
Queried concerning the variance in thickness found in the random core samples of the asphalt on the parking lot, Bryant expounded:
"Well, this would be due grade. This is normal on an overlay parking lot. It says here an inch and a half, but it should have been written out maybe as an average of an inch and a half, because you have a lot that is already there and sunk and wavy and what have you, it is not going to be true to grade, and then when you come in and overlay it with a machine it carries a true plane and when it goes across the top of a bump here it will be thinner here than it will be on the other side of that bump, and all over that lot you liable to find some places out there that has two inches and some places an inch you know."
Leland Carter, an expert in the asphalt construction business employed by a Shreveport engineering firm, at Thompkins' request examined the B.S.T. Testing report and visually inspected the parking lot. He testified that "there were several joints that looked like they were in exceedingly bad shape and they would have to be either cut out and there were some areas that would need to be patched, and certain areas probably needed an additional overlay on it."
Questioned concerning the cost of remedial work, Carter replied that he gave Thompkins a "ballpark figure" because "probably the cheapest way to bring that remedial measure would be a complete overlay of the lot which would run about $19,000." This recommendation was verbal, Carter explained, because they "just talked more or less in general terms."
Our review of the record leads us to the conclusion that the trial judge was not clearly wrong in the fact-finding that plaintiff had substantially performed the contract. As explained by Patel and Bryant, and admitted by Brown, the testing of core samples revealing an average asphalt thickness of .14 inch less than the stipulated 1½ thickness did not in itself represent a defect in view of the impossibility of achieving a uniform thickness when overlaying an existing surface. On the other hand, the evidence was unrefuted that plaintiff exceeded the accepted industry formula in applying the tonnage of asphalt generally recognized as necessary to overlay the area in question to a thickness of 1½ inches.
Repair of the two or three loose joints appeared to require only minor remedial work. Use of the parking lot by defendant's customers for some seven months between plaintiff's purported completion of its work and the trial date indicated rather conclusively that the purpose of the contract was accomplished to the manifest benefit of defendant.
Finding that there was substantial performance of the contract by plaintiff, the next question is whether defendant proved the existence of defects or omissions and, if so, proved the cost of correcting the defects or completing the unfinished work. As previously noted, defects in the job appeared to consist of several joints which were unravelling and some loose rocks. However, we agree with the trial judge that defendant did not prove with the required exactness the cost of repairing these *297 defects. Carter's "ballpark" figure of $19,000 obviously contemplated a virtual redoing of the entire projectthe necessity of which was ruled out by the preliminary finding of substantial performance. On the other hand, Bryant's "off the top of the head" estimate of $11,000 included seal coating which was not required by plaintiff's contract.
Contrary to appellant's argument, this evidence was insufficient, not because it involved "estimates", but because it did not purport to directly address with any degree of precision the nature of the work contemplated to correct the proven deficiencies.
In summary, defendant did not discharge its burden of proving the sum by which plaintiff's recovery of the contract price should be reduced. Therefore, the trial judge was correct in holding that plaintiff was entitled to recover the full contract price.
This disposition of the foregoing legal issues pretermits the necessity of our considering the correctness of the trial judge's alternative finding that defendant was barred from recovery for cost of curing the defects (even if proved) because it accepted the work performed under the contract.
For the reasons set forth, we affirm the judgment of the district court, at appellant's cost.
NOTES
[1] Art. 2756.

To build by a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price.
[2] Art. 2769.

If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.