465 So.2d 851 (1985)
B & B CUT STONE CO., INC., Plaintiffs-Appellants,
v.
Jack S. RESNECK & Elise Roos Resneck, Defendants-Appellees.
No. 16777-CA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 1985.
*853 Tucker, Jeter & Jackson by James C. McMichael, Jr., Shreveport, for plaintiffs-appellants.
Roos & Roos by Armand L. Roos, Shreveport, for defendants-appellees.
Before HALL, FRED W. JONES, Jr. and NORRIS, JJ.
NORRIS, Judge.
Plaintiff, B & B Cut Stone Company Inc. ("B&B"), brought this suit against defendants, Dr. and Mrs. Jack Resneck, for $7,560, the amount claimed due under an alleged contract to install a marble fireplace in the Resnecks' home. The Resnecks answered, contesting the amount demanded in the petition. They also reconvened, claiming first, damages for repair of the incomplete or defective project and second, moral damages for breach of a contract of which the principal object was intellectual and artistic. The trial court gave judgment on all claims: B & B received $5,345 on its principal claim, under a theory of quantum meruit; the Resnecks received $5,621 for the cost of repair; and the Resnecks also received $5,000 in nonpecuniary damages. B & B has appealed suspensively. For the reasons expressed, we affirm.

FACTS
The defendants, Jack and Elise Resneck, own a large, elegant home on Gilbert Avenue in Shreveport. They have been engaged in an ongoing redecoration project for some time. In early 1982 they turned their attention to the master bedroom and bath. They contemplated about $35,000 in construction work and about the same figure for new fixtures and furniture. They decided to include, as a focal point of the project, an elegant and commanding marble fireplace with a hearth and large firewall. The planning was essentially in the hands of Mrs. Resneck and her interior designer, Mr. Thomas.
The first contact between Mrs. Resneck and B & B was through a prospective contractor who did not get the job. B & B had quoted a price of $5,345 to the unsuccessful contractor, based on Travertine marble. Because of the special value they placed on the fireplace and their desire to monitor its progress closely, Mrs. Resneck and Mr. Thomas decided to make separate arrangements for it with B & B, while hiring another contractor to coordinate the rest of the work. After a visit to B & B's showroom, Mrs. Resneck settled on a more expensive marble, St. Florient Rose. B & B's president, Mr. Mogg, testified that St. Florient would cost twenty to thirty percent more than Travertine; it is not clear, however, that any final contract price was agreed on by the parties. R.p. 75, 275. Nevertheless, Mr. Mogg inspected the site on June 1, took measurements and prepared shop drawings from which he proceeded to have the marble slabs cut and polished. He began installation on Saturday, June 3. The contract was never reduced to writing.
Almost from the beginning, however, problems arose in the installation process. The most significant ones included the removal of several slabs that were installed the first day, in order to add more supportive plaster, and the breakage of two slabs that had been cut in an irregular shape to accommodate a firebox that Mr. Resneck insisted on. These events necessitated much tracking in and out the house, disturbing Mrs. Resneck and adding to her concern that the work was not being done competently.
The "finished product" was unacceptable to the Resnecks and to Mr. Thomas. B & B made a number of corrective adjustments but, according to the Resnecks, these measures worsened the situation and made the fireplace more unsightly. We will describe the Resnecks' complaints in the discussion of Assignments 1 and 2. After a few weeks of dickering, the parties broke off negotiations and B & B filed the instant suit on January 21, 1983.

*854 ISSUE # 1: Nature of the contract.
As a threshold matter, we note the trial court's oral finding that the parties never reached any specific agreement as to price. R.p. 428. This finding is not manifestly erroneous. While it is clear that Mr. Mogg communicated to Mrs. Resneck the original contract price of $5,340 and that she agreed to it, R.p. 220-221, it is not clear that they ever discussed a final price, necessarily higher, to reflect the additional work and the finer-grade marble. This finding, however, did not make its way into the written reasons for judgment and we feel impelled to discuss it because of its potential impact on the application of contract law to this case.
In many instances, failure to settle on a price is fatal to the alleged contract. "Price" is a specific requirement for a contract of sale, LSA-C.C. art. 2439, as is a "certain stipulated price," for a contract to build by plot or work by the job, LSA-C.C. art. 2756. Lack of a price necessarily defeats a construction contract. See Southern Mosaic Tile Inc. v. Alessi, 411 So.2d 601 (La.App. 1st Cir.1982); Villars v. Edwards, 412 So.2d 122 (La.App. 1st Cir. 1982), writ denied 415 So.2d 945 (La.1982); see also Skains v. White, 391 So.2d 1327 (La.App. 2d Cir.1980). The general requirements for a valid contract are found in LSA-C.C. art. 1779 (repealed effective January 1, 1985):
1. Parties legally capable of contracting.
2. Their consent legally given.
3. A certain object, which forms the matter of the agreement.
4. A lawful purpose.
In the instant case, all parties possessed legal capacity to contract; there was no vice of consent and no illegality of purpose. The difficulty lies in the requirement of a certain object. An object is defined in LSA-C.C. art. 1883 (also repealed) as "something which one or both of the parties oblige themselves to give, to do, or not to do." Since the intended agreement was bilateral, under LSA-C.C. art. 1765 (repealed; new art. 1908), the requirement of a certain object must be satisfied for both obligations. Thus, B & B was obligor of the obligation to build a marble fireplace; the Resnecks were obligors of the obligation to pay a price of at least $5,340, although the exact amount was uncertain, with no provisions for its determination. See LSA-C.C. art. 1886 (repealed; new art. 1973).
Because of this failure to prove a certain object, a sum of money, under article 1779 (and a stipulated price under article 2756), we are constrained to hold that there was no contract between B & B and the Resnecks for construction of the fireplace.
This determination, however, does not leave the parties without redress. As the court in Villars v. Edwards, supra, explained:
The civil law of Louisiana recognizes the equitable doctrine of quantum meruit, based on the concept that one who benefits by the labor and materials of another should not be unjustly enriched thereby. Under those circumstances, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefor. The equitable doctrine of quantum meruit is based on the theory of quasi-contract, LSA-C.C. arts. 2292-2294, and on the Christian principle of fairness proclaimed in LSA-C.C. art. 1965. 412 So.2d at 125.
LSA-C.C. art. 2292 provides in part:
Certain obligations are contracted [formed] without any agreement, either on the part of the person bound, or of him in whose favor the obligation takes place.
* * * * * *
The obligations, which arise from a fact, personal to him who is bound, or relative to him, result from quasi contracts, or from offenses and quasi-offenses.
*855 LSA-C.C. art. 2293 provides:
Quasi contracts are the lawful and purely voluntary act of a man, from which there results any obligation whatever to a third person, and sometimes a reciprocal obligation between the parties. [Emphasis added.]
LSA-C.C. art. 2294 provides in part:
All acts, from which there results an obligation without any agreement, in the manner expressed in the preceding article, form quasi contracts. * * *
These principles apply to the instant case because of B & B's acts in placing the marble fireplace in the Resneck's house and because of the Resnecks' reciprocal acts of planning and negotiating with B & B. It would be unfair for B & B to expend such labor and time without recompense. Similarly, it would be unfair for the Resnecks not to receive an acceptable job under the circumstances. This is all the more true when the parties intended to be mutually bound, admitted a large part of their obligations, and performed mostly in compliance with their negotiations. We therefore hold that even though there was a failure of the technical requirements for a valid contract, the parties are nevertheless bound under obligations derived from quasi contract.
This holding is consistent with out law's concepts of "contract" and "obligation," both in the 1870 Code and clarified by the 1984 Code Revision. See LSA-Act 1984, No. 331.[1] An obligation is a legal relationship whereby a person, called the obligor, is bound to render performance in favor of another, called the obligee. LSA-C.C. art. 1756 (1985; old article 1761). A contract is a source of obligations, LSA-C.C. art. 1906 (1985), but not the only source, LSA-C.C. arts. 1757 (1985) and 2292. In the absence of a contract, the underlying obligation, derived from quasi contract, may produce all the effects of obligations, including recovery of damages for the obligor's failure to perform, or his defective or delayed performance. LSA-C.C. art. 1758(A)(3) (1985; old article 1926).
All three elements of damages awarded in the instant case fall clearly under the purview of the effect of obligations. Thus, we have awarded a contractor quantum meruit when there was no agreement as to price.[2]Skains v. White, supra; see also Porter v. Johnson, 408 So.2d 961 (La.App. 2d Cir.1981), writ denied 412 So.2d 99 (La.1983). Similarly, other courts have awarded a sum necessary to repair or complete the work, in the absence of a price. Villars v. Edwards, supra.
We have not been able to find any instance where a court has awarded moral damages in a quasi contractual setting, but we see no reason not to do so, provided the object of the obligation is certain, which it was, in the case of the fireplace, and provided the other strict requirements for moral damages are met, as we will discuss at length under Assignment No. 3.

ISSUE # 2: Substantial completion.

(Assignments 1 & 2)
In these assignments of error, B & B claims the trial court erred in finding B & B had not substantially performed their obligation and that, consequently, it was *856 also error to assess B & B with damages for the cost of completion.
We note parenthetically that the Resnecks have not appealed the quantum meruit award to B & B so it is not before us. We make this observation partly to describe the posture of the case and partly to express our inability to find any evidence in the record to support the sum of $5,345, except for an estimate on a preliminary shop drawing, marked as Joint Exhibit # 3. This estimate was never explained, itemized or substantiated for the record and, if appealed, it would have been very vulnerable.
B & B has cited our opinion in Design & Corrosion Eng. v. Piggly Wiggly, 408 So.2d 292 (La.App. 2d Cir.1981) for the proposition that a construction project, performed not entirely up to specs, may still be considered substantially complete. The factors to be considered in a determination of this kind are:
(1) Extent of the claimed defects or incomplete work;
(2) Degree to which the purpose of the contract is defeated;
(3) Ease of correction;
(4) Use or benefit to the owner of the work performed.
See Airco Refrigeration Serv. Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961). To these we should add a fifth factor, the trial court's great discretion in making findings of fact. Design & Corrosion Eng. v. Piggly Wiggly, supra at 296; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The second and fourth factors mentioned above are more applicable to the question of moral damages in Assignment No. 3, since B & B contends that the fireplace is entirely usable as a structure for burning wood and providing warmth, while the Resnecks claim the fireplace utterly fails to serve its intended artistic purpose. Nevertheless, we consider the trial court's general determination that the job was defective or incomplete to be essentially a factual call; the trial judge was in a superior position to assess the evidence; his conclusion is not manifestly erroneous.
As for the extent of defects, the first factor, the evidence is voluminous. The Resnecks' complaints, and the trial court's findings, seemed to fall into nine categories:
First, the marble panels of the firewall did not reach the ceiling; in an attempt to remedy this, B & B installed an unsightly marble strip along the top. Every witness admitted this to be the case and the photographs confirm it. Similar conditions have been held to be defective in other cases. In Campagna v. Smallwood, 428 So.2d 1343 (La.App. 4th Cir.1983), the rear wall was misaligned and leaned in, and roof panels were mis-lapped. In Sweetser v. Streva, 450 So.2d 1007 (La.App. 1st Cir. 1984), the level of the roof was not "square." B & B said the marble was a poor fit because the floor, carpet and moulding were not in place when the work started. But B & B admitted failing to take measurements at points in the center of the wall, taking measurements only at the edges. R.p. 98, 108.
Second, the seams between the marble slabs were uneven. This condition was held to be defective in Davidge v. H & H Const. Co., 432 So.2d 393 (La.App. 1st Cir. 1983), where the routing design around the doors was uneven; in Ducote v. Arnold, 416 So.2d 180 (La.App. 4th Cir.1982), where sheetrock seams were not "floated" properly; and in Manzanares v. Am. Int'l Forest Prod., 389 So.2d 1142 (La.App. 3d Cir. 1980), writ denied 395 So.2d 811 (La.1980), where pine boards shrunk and left uneven gaps between one another.
Third, the caulking in the seams was brittle and did not match the color of the marble. This was in spite of Mr. Thomas's instruction to make the caulking match. R.p. 154. One expert witness, however, said the seams were acceptable. R.p. 413.
Fourth, the cutting and caulking around the fireplace was incorrect and unsightly. The firescreen was black and the caulking white, making it especially noticeable. *857 When B & B sent a workman to paint the woodbox caulking, he mistakenly repainted the firescreen, this time a shiny black instead of matte. R.p. 174.
Fifth, the woodbox was improperly placed, leaving a gap in the marble. Mrs. Resneck said she would accept a new woodbox. R.p. 241.
Sixth, the hole for the gas jet was in the wrong place. B & B adjusted it and filled in the hole with an ugly red epoxy that did not match the marble. An expert architect thought the marble setters had probably bent the gas jet, R.p. 425. In fact, B & B's marble setter admits it. R.p. 401.
Seventh, the naturally-occurring voids in the marble were filled with the same red epoxy. The Resnecks' expert said the patching was incorrect. R.p. 330. And yet small voids are expected in marble.
Eighth, the hearth, instead of being level with, was higher than the carpet and was elevated with an ugly white plaster. Later, the hearth cracked. There were numerous explanations of how the hearth wound up too high, in spite of instructions to the contrary. The excess height may have caused the crack. A cracked pavement was held to be a defect in Donnelly v. Drexel Homes Inc., 252 So.2d 357 (La.App. 4th Cir.1971), as was a cracked terrazzo floor in Dinon Terrazzo & Tile Co. v. Tom Williams Const., 162 So.2d 795 (La.App. 4th Cir.1964).
Finally, the marble surface has begun to develop a chalky discoloration that requires polishing. This common problem is usually held to be defective. See Martin v. AAA Brick Co. Inc., 386 So.2d 987 (La.App. 3d Cir.1980); PPG Industries Inc. v. Schega, 362 So.2d 1128 (La.App. 4th Cir.1978); Sweetser v. Streva, supra; cf. Kihneman v. Gus Elfer Co. Inc., 201 So.2d 1 (La.App. 4th Cir.1967).
This small sampling of the evidence of defects should be sufficient to support the trial court's finding. The problems were very extensive. As Dr. Resneck summed up, "There are parts of this I could live with if I had to. It's just you add them together in a whole and it does not become a liveable thing." R.p. 207.
The final factor for our consideration is the ease of correction. B & B's second assignment of error complains that it should not be held liable for defects attributable to the Resnecks' fault. As the preceding excursus of defects shows, several of the items could have been attributed to either B & B or the Resnecks. Although the trial court did not specifically so state, he directed all fault to B&B. In the case of conflicting testimony, his determination should stand. Arceneaux v. Domingue, supra.
B & B further contends that the amount awarded for repairs is excessive. We find, however, that the elements of damage outlined by the trial court very accurately track the contractor's quoted prices for repair work. These prices are explained comprehensively to the trial court. R.p. 291-300.[3]
The fact that the Resnecks' new marble contractor hails from Houston and must transport and put up his crew for the job, is of no moment. According to the record, B & B is the only marble contractor in Shreveport. R.p. 227. In their default, the Resnecks must go out-of-town for performance. We do not think the award of $3,000 for this item is excessive.
In sum, we conclude the trial court was not manifestly erroneous in its finding of defective or insubstantial completion and that the damages for repairs are appropriate.

ISSUE # 3: Moral Damages

(Assignment 3)
In their reconventional demand, the Resnecks claimed nonpecuniary damages for breach of a contract whose principal *858 object was intellectual enjoyment and aesthetic appeasement. Damages of this sort, called "moral damages," are derived from LSA-C.C. art. 1934(3) (now repealed), which provides:
3. Although the general rule is, that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party. Where the contract has for its object the gratification of some intellectual enjoyment, whether in religion, morality or taste, or some convenience or other legal gratification, although these are not appreciated in money by the parties, yet damages are due for their breach; a contract for a religious or charitable foundation, a promise of marriage, or an engagement for a work of some of the fine arts, are objects and examples of this rule.
In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, while in other cases they have none, but are bound to give such damages under the above rules as will fully indemnify the creditor, whenever the contract has been broken by the fault, negligence, fraud or bad faith of the debtor. [Emphasis added.]
In his written opinion, the trial court listed his findings of fact that established proof of the Resnecks' injury. These included the inconvenience they have suffered by having an incomplete bedroom for over six hundred days, the ordeal of being sued and listed in the Daily Legal News, plus the time and expense of defending and asserting their rights in this litigation.
The trial court then explained his conclusion that the object of the contract fell within the contemplation of article 1934(3).[4] This is because the parties intended it to be a work of art, it served no utilitarian function, and it was not a necessity of life.
Having thus outlined the elements of damage and the applicability of article 1934(3), the trial court set the Resnecks' recovery in moral damages at $5,000. B & B has appealed this ruling, claiming that moral damages are never appropriate in the context of a construction contract.
Unfortunately, the language of the article is not susceptible of easy interpretation; careful analysis also flounders in the poor English translation of the French source. See Litvinoff, Moral Damages, 38 La.L. Rev. 1, 7 (1977). The stormy jurisprudence is likewise difficult to explain. In the seminal case of Meador v. Toyota of Jefferson, 332 So.2d 433 (La.1976), the plaintiff sought damages for aggravation, distress and inconvenience from a repairman who unnecessarily and excessively delayed completion of repair of her vehicle, a 1971 Toyota. In spite of her initial success in civil district court, plaintiff suffered reversal on appeal. In affirming this reversal, the supreme court explained that the touchstone of moral damages is "intellectual enjoyment [as] a principal object of the contract, notwithstanding that peripheral, or incidental, or even perhaps concurrent object of the contract may be physical gratification." 322 So.2d at 437. Since plaintiff's overriding concern had to be the utility or physical gratification of the automobile, and not any intellectual enjoyment, there could be no recovery of moral damages.[5]
Armed with this analysis, our brethren on the fourth circuit unqualifiedly denied recovery from breach of a building contract *859 for a home because the object of the contract did not include some intellectual enjoyment. Catalanotto v. Hebert, 347 So.2d 301 (La.App. 4th Cir.1977). The supreme court reached a similar conclusion in Ostrowe v. Darensbourg, 377 So.2d 1201 (La. 1979).
Different facts, however, demand different results, as in Whitener v. Clark, 356 So.2d 1094 (La.App. 2d Cir.1978), writ denied 358 So.2d 638, 641 (La.1978). The facts of this case are related in our earlier opinion of Clark v. Whitener, 296 So.2d 393 (La.App. 2d Cir.1974). The plaintiff, Dr. Whitener, had contracted to build a distinctive residence for $148,500 in 1971. The house was to include special features, such as a "cathedral room," a swimming pool and sauna, and special tile flooring. When the "finished product" exhibited ninety-one defects, plaintiff suffered mental distress caused by the shattering of her dreams to own a beautiful home. We affirmed her award of $5,000 in moral damages.
B & B has strongly urged this court that the decision in Martin v. AAA Brick Co. Inc., 386 So.2d 987 (La.App. 3d Cir.1980), should govern here. The facts in Martin are somewhat similar to those in the instant case, as plaintiffs there secured defendant's services to build a brick fireplace in their home, with the special proviso that the contractor use as many of plaintiffs' leftover bricks as possible. The finished product was found to be unworkmanlike and a breach of contract. The court concluded that, "the record does not establish that intellectual enjoyment was a principal or exclusive object of the contract" and that moral damages were accordingly not recoverable.
We think, however, that the same analogy as exists between Catalanotto-Ostrowe and Whitener, also exists between Martin and the instant case.[6] The Resnecks wanted far more than a basic brick fireplace. Every witness admitted that marble is desirable because of its beauty and elegance. Its durability is only a secondary quality. The record clearly reveals that the fireplace was not chosen for its thermal value, but rather for its impressive presence and its distinct ability to express the housewide motif of simple lines and open spaces.[7] R.p. 142-146. Mrs. Resneck even matched her other furniture with the color of the marble. R.p. 247. Any lingering doubt as to the aesthetic objective of the project should be obviated by the fact that the Resnecks intended to use the firewall as a backdrop on which to hang their modern paintings; such a massive marble facing could not possibly serve any function pertinent to burning wood.
A similar result was reached in the recent case of McManus v. Galaxy Carpet Mills Inc., 433 So.2d 854 (La.App. 3d Cir. 1983). In that case, moral damages were allowed in a breach of contract to install carpet in plaintiff's home. After installation, the carpet began to develop discolored spots. Conceding the utility and serviceability of the carpet had not been affected, the court noted plaintiff's wife's special sensibilities as an interior decorator and her special choice of "Touch of Velvet, Pearl Gray" as a benchmark for her color coordination of the entire house. The court found that plaintiff, as well as his wife, was affected by these considerations.
We think these considerations amply justify the trial court's result. We therefore find it unnecessary to pursue the further argument, based on Emond v. Tyler Building & Const. Co. Inc., 438 So.2d 681 *860 (La.App. 2d Cir.1983), that if the injury sounds in tort, then the damages are recoverable. Nor do we have to consider the strained decisions in Gele v. Markey, 387 So.2d 1162 (La.1980) and Ducote v. Arnold, 416 So.2d 180 (La.App. 4th Cir.1982), which would allow a very strong showing of mental distress to prevail in a contract whose objective was not really intellectual or aesthetic. We hold that the obligation in the instant case had an intellectual, artistic objective and that the Resnecks have made a sufficient showing of inconvenience, aggravation, humiliation and disappointment to justify the trial court's award.
Finally, the source article admonishes us, "In the assessment of damages under this rule, as well as in cases of ... quasi contracts, much discretion must be left to the judge or jury[.]" We can find no abuse of this much discretion.
Accordingly, this portion of the judgment is affirmed.

DECREE
For the reasons expressed, the judgment of the trial court is hereby affirmed. Costs of this appeal are assessed to appellant, B & B Cut Stone Co. Inc.
AFFIRMED.
NOTES
[1] Here and elsewhere, we will refer to both the old and new code articles. Even though the new articles are not strictly applicable to this case, we find that for the most part they merely restate the law. See, for example, the Official Revision Comments to LSA-C.C. arts. 1756, 1757, 1758, 1906 (1985). The new articles are generally clearer than the old. One particular point of confusion was old article 1761, which defined a contract as "an agreement, by which one person obligates himself to another, to give, to do or permit, or not to do something." This definition does not clearly distinguish between the concepts of "contract" and "obligation," although it is possible to read through the confusion. See A. Levasseur, Precis in conventional obligations, 1, 4 (1980).
[2] We have made this distinction because quantum meruit is typically awarded in true contract cases for the value of partial performance that benefits the owner in spite of defective work or insubstantial completion. LSA-C.C. art. 2756; Ryan v. Alexander, 336 So.2d 944 (La.App. 2d Cir.1976); Brady v. Jay, 111 La. 1071, 36 So. 132 (1904).
[3] There were, however, two minor errors: first, the cost of repainting was set at $220, not $270, as stated by the trial court (R.p. 297, 29); second, an apparent mathematical error in the final judgment. Since neither party complained of these errors and since the difference of $5.52 is de minimis, we will not disturb the quantum.
[4] The new code article, LSA-C.C. art. 1998 (1985), changes the law by permitting recovery for breach of a contract "intended to gratify a nonpecuniary interest," and introducing a knowledge requirement on the part of the obligor. See Official Revision Comment (a). Thus the new article is not pertinent to our discussion of this case.
[5] The majority in Meador expressed its dissatisfaction with the result, saying, "Perhaps it would be better if damages for mental anguish in breach of contract cases were allowable just as in tort actions.... Our responsibility is to interpret and apply the law, not to enact it." 332 So.2d at 438. Justice (now Chief Justice) Dixon dissented from the majority opinion.
[6] Consider also the example proffered by Professor Litvinoff in Moral Damages, 38 La.L.Rev. at 11. He contrasts contracts of trans-Atlantic crossing in steerage and in a luxury liner. Moral damages would surely be recoverable for breach of the latter, but not for breach of the former. It is interesting to consider how the result in Meador would have differed, had the plaintiff been driving an antique Bentley or an XJ-7 or anything more elevated than the proletarian Toyota.
[7] In this manner, the Resnecks successfully contradict B & B's argument for substantial completion. Since the purpose was to obtain a work of art, there is no completion in a cracked and unlevel fireplace that happens to contain heat.